# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF ST. LOUIS, Derivatively on Behalf of FIRSTENERGY CORP., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES E. JONES, MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL, III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, PAUL T. ADDISON, JERRY SUE THORNTON, WILLIAM T. COTTLE, GEORGE M. SMART, JUSTIN BILTZ, MICHAEL J. DOWLING, JAMES F. PEARSON, STEVEN E. STRAH, K. JON TAYLOR, ROBERT REFFNER, and EBONY YEBOAH-AMANKWAH, <br><br> Defendants, <br><br> and <br><br> FIRSTENERGY CORP., <br><br> Nominal Defendant. | Case No.: <br><br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE ....................................................................... 8

III.    PARTIES ......................................................................................................... 8

        A.      Plaintiff .................................................................................................. 8

        B.      Nominal Defendant ............................................................................... 9

        C.      The Individual Defendants .................................................................... 9

                1.      The Director Defendants ............................................................ 9

                2.      The Officer Defendants ........................................................... 13

        D.      Relevant Non-Parties ......................................................................... 15

IV.     FIRSTENERGY'S DIRECT INVOLVEMENT IN THE OHIO BRIBERY
        SCHEME ....................................................................................................... 17

        A.      Background of FirstEnergy and the Company's History of Corporate
                Governance and Oversight Failures .................................................... 17

        B.      Amidst a Grim Outlook, FirstEnergy Turns to Shady Backroom Deals,
                Despite Investor Demands for Increased Transparency ...................... 21

        C.      The Director Defendants Consciously Ignored Persistent and Pervasive
                Red Flags as the Bribery Scheme Began ............................................. 27

        D.      The Director Defendants Consciously Ignored Further Red Flags Related
                to Householder and Generation Now as HB6 was Passed ................... 37

        E.      The Director Defendants' Failure to Exercise Oversight Resulted in
                FirstEnergy's Continued Involvement in the Bribery Scheme ........... 48

        F.      The U.S. Attorney's Complaint Implicates FirstEnergy in the Largest
                Public Bribery Scheme in Ohio History .............................................. 52

        G.      The Fallout from the Bribery Scheme Continues ............................... 59

        H.      Defendants Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-
                Amankwah Unlawfully Profited at FirstEnergy's Expense by Selling
                Shares While in Possession of Non-Public Information ...................... 66

V.      THE DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT ....... 71

A.      Defendants Issue False Proxies in Violation of Section 14(a) of the
        Exchange Act ................................................................................... 71

        1.      The Director Defendants Caused First Energy to Issue Materially
                False and Misleading Statements in the 2018 Proxy ............................. 71

        2.      The Director Defendants Caused First Energy to Issue Materially
                False and Misleading Statements in the 2019 Proxy ............................. 76

        3.      The Director Defendants Caused First Energy to Issue Materially
                False and Misleading Statements in the 2020 Proxy ............................. 81

VI.     DAMAGES TO FIRSTENERGY .................................................................. 86

VII.    DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S
        INTERESTS ............................................................................................. 87

        A.      The Duties of All Defendants ............................................................. 87

        B.      The Company's Code of Business Conduct, the Board of Directors Code
                of Ethics and Business Conduct, Corporate Governance Policies, Insider
                Trading Policy, Corporate Political Activity Policy and Board Committee
                Charters ......................................................................................... 89

VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .................................. 100

        A.      Demand is Excused Because the Director Defendants Face a Substantial
                Likelihood of Liability ...................................................................... 101

                1.      The Director Defendants Face a Substantial Likelihood of Liability
                        for Disseminating False and Misleading Proxy Materials .................... 101

                2.      The Director Defendants Face a Substantial Likelihood of Liability
                        for Failing to Exercise Their Fiduciary Duties to FirstEnergy ............. 103

        B.      Demand is Excused Because Director Defendants' Conduct Did Not
                Constitute a Valid Exercise of Business Judgment ......................................... 106

IX.     CLAIMS AGAINST DEFENDANTS ............................................................... 110

X.      PRAYER FOR RELIEF ............................................................................. 116

XI.     JURY DEMAND ..................................................................................... 117

## CAST OF CHARACTERS

| NAME | TITLE | AFFILIATION |
| --- | --- | --- |
| Anderson, Michael J. | Director (2007-Present); Chair of the Audit Committee; Member of the Finance Committee | FirstEnergy |
| Biltz, Justin | Director, State Regulatory Affairs – Ohio (May 2016 - August 2018) Director, State & Regulatory Affairs (August 2018 – present) | First Energy |
| Borges, Matthew | Registered Lobbyist for FirstEnergy Solutions | FirstEnergy Solutions |
| Cespedes, Juan | Multi-Client Lobbyist Retained by FirstEnergy Solutions | FirstEnergy Solutions |
| Clark, Neil | Ohio Based Lobbyist | Enterprise |
| Demetriou, Steven J. | Director (2017-Present); Member of the Finance and Operations, Safety and Nuclear Oversight Committees | FirstEnergy |
| Dowling, Michael | SVP, External Affairs (2011-Present); Vice President, External Affairs (2010-2011); Vice President, Communications (2008-2010) | FirstEnergy |
| Householder, Larry | Member of the Ohio House of Representatives (January 2017-Present); Speaker of the House (January 2019-July 30, 2020) | Ohio House of Representatives |
| Johnson, Julia L. | Director (2011-Present); Chair of the Corporate Governance and Corporate Responsibility Committee; Member of the Finance Committee | FirstEnergy |
| Jones, Charles E. | CEO and Director (2015-Present) | FirstEnergy |
| Longstreth, Jeffrey | Campaign and Political Strategist to Larry Householder | Enterprise |
| Misheff, Donald T. | Director (2012-Present); Non-Executive Chairman of FirstEnergy Board (May 2018-Present); Member of the Audit and Corporate Governance and Corporate Responsibility Committees | FirstEnergy |
| Mitchell, Thomas N. | Director (2016-Present); Chair of the Operations, Safety and Nuclear Oversight Committee; Member of the Corporate Governance and Corporate Responsibility Committee | FirstEnergy |
| O'Neil, III, James F. | Director (2017-Present); Chair of the Compensation Committee; Member of | FirstEnergy |

| NAME | TITLE | AFFILIATION |
|------|-------|-------------|
| | the Operations, Safety and Nuclear Oversight Committee | |
| Pappas, Christopher D. | Director (2011-Present); Chair of the Finance Committee; Member of the Compensation Committee | FirstEnergy |
| Pearson, James F. | VP of Finance (March 2018-April 2019); CFO (2013-March 2018) | FirstEnergy |
| Pianalto, Sandra | Director (2018-Present); Member of the Compensation and Audit Committees | FirstEnergy |
| Reffner, Robert | SVP and Chief Legal Officer (2018-Present) | FirstEnergy |
| Reyes, Luis A. | Director (2013-Present); Member of the Corporate Governance and Corporate Responsibility Committee and Operations, Safety and Nuclear Oversight Committee | FirstEnergy |
| Strah, Steven E. | President (May 2020-Present); CFO (March 2018-May 2020); Senior VP of FirstEnergy's Utilities Operations (Until March 2018) | FirstEnergy |
| Taylor, K. Jon | CFO (Present); Vice President of Utilities Operations (2019-2020) | FirstEnergy |
| Turner, Leslie M. | Director (2018-Present); Member of the Audit and Compensation Committees | FirstEnergy |
| Yeboah-Amankwah, Ebony | Vice President, General Counsel and Chief Ethics Officer | FirstEnergy |

*"**This is likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio. This was bribery, plain and simple. This was quid pro quo.**"*

—David DeVillers, United States Attorney, Southern District of Ohio

## I.     INTRODUCTION

1.      Plaintiff Employees Retirement System of the City of St. Louis ("Plaintiff"), a shareholder of FirstEnergy Corp. ("FirstEnergy" or the "Company"), brings this shareholder derivative action on behalf of FirstEnergy against the Company's current and former officers and directors identified below (collectively, "Defendants") arising from Defendants' breaches of fiduciary duties and violations of state and federal law from September 9, 2016 through the present (the "Relevant Period").[1] As discussed below, Defendants in this action orchestrated a massive, years-long bribery, racketeering and pay-to-play scheme in which FirstEnergy illegally funneled over $60 million to the Ohio Speaker of the House, Larry Householder ("Householder"), and other public officials in exchange for favorable legislation, culminating in a historic criminal complaint filed by the U.S. Attorney for the Southern District of Ohio. The recent revelations of the criminal scheme and Defendants' knowledge or blatant disregard of it have deeply damaged FirstEnergy, and additional damages to the Company will continue in the coming months and years.

---

[1] Plaintiff, through its undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation of its undersigned counsel, which includes a review and analysis of: (i) findings and allegations by Ohio state and federal authorities in connection with the misconduct in this action and the criminal indictments arising therefrom, including case filings in *USA v. Householder, et. al.,* 1:20-cr-00077-TSB (S.D. Oh.) and *USA v. Borges*, 1:20-mj-00526 (S.D. Oh.); (ii) filings by FirstEnergy with the U.S. Securities and Exchange Commission ("SEC"); (iii) various investigative news articles concerning Defendants' misconduct; (iv) securities analysts' reports about FirstEnergy; (v) wire and press releases and other publications disseminated by FirstEnergy and related parties; (vi) shareholder communications, conference calls and postings on the Company's websites; and (vii) other publicly available information concerning FirstEnergy. While FirstEnergy is named as a nominal defendant herein, any reference to "Defendants" does not encompass the Company.

1

2.      Defendants' misconduct began in late 2016. At that time, FirstEnergy had been struggling mightily for years, forced to sink hundreds of millions of dollars to maintain aging nuclear power plants in Ohio that had become financially unsustainable, while the demand for nuclear energy diminished and the costs of maintenance increased. Faced with these difficulties, FirstEnergy sought "legislative solutions" to rescue the Company from its dire financial straits. However, FirstEnergy's previous attempts at lobbying for a legislative lifeline had been wholly unsuccessful, and without such a solution, FirstEnergy's future prospects were dismal.

3.      At the same time, Householder was seeking to re-enter Ohio politics, having resigned in disgrace from his former position as Speaker of the House in 2004 amidst accusations that he accepted kickbacks from vendors and traded legislation for campaign contributions. Despite his checkered past, Householder ran, and won, the November 2016 election for the House seat in Ohio's 72nd District, which was the first step in the conspiracy's strategy to re-elect Householder as Speaker. Householder took office on January 3, 2017, and just days later, FirstEnergy flew Householder on the Company's private jet to Washington, D.C., to attend the presidential inauguration.  Two months later, in March 2017, FirstEnergy and its subsidiaries made the first of a series of $250,000 quarterly payments to a 501(c)(4) entity called "Generation Now" that Householder secretly controlled and had established just weeks earlier—an entity that Householder's co-conspirator would later describe as structured to allow "donors" to "give as much or more to the (c)(4) and nobody would ever know."

4.      From that point forward, FirstEnergy and its subsidiaries "donated" tens of millions of dollars—while publicly reporting only a fraction of that amount—to various entities controlled by Householder to support Householder's bid for Speaker of the House, as well to support other House candidates that FirstEnergy and Householder believed would ultimately vote for

2

Householder's candidacy. Householder also siphoned funds for his own personal benefit, including to settle a personal lawsuit, to pay for costs associated with his personal Florida residence, and to pay off thousands of dollars of credit card debt. The brazen scheme was ultimately successful, with Householder re-elected as Speaker of the House in January 2019. Shortly after Householder's term began, the criminal conspiracy's ultimate aim was accomplished: House Bill 6 ("HB6") was introduced in the Ohio state legislature in early 2019; the legislature passed the bill in July 2019; and that same month, Ohio Governor Mike DeWine signed the bill into law.

5.       HB6 provided a massive $1.3 billion bailout for FirstEnergy's uncompetitive power plants funded by monthly ratepayer surcharges, as well as other one-sided legislative amendments, including provisions that removed incentives to build renewable energy projects, canceled statewide energy conservation efforts, and allowed the Company to upcharge Ohio customers for their energy. The sweetheart deal was immediately derided by contemporaneous news reports as the "worst energy bill of the 21st century," and was "overwhelmingly opposed by ratepayer groups, business groups, free market conservative groups, environmental groups, and Ohioans generally." The criticism of the law was so fierce that HB6 faced an immediate statewide ballot referendum seeking to repeal it, which FirstEnergy vehemently opposed. Indeed, FirstEnergy funneled an additional $38 million in the span of just a few short months to oppose the initiative, even going so far as to bribe an employee of a signature collection firm to sabotage it. FirstEnergy's efforts paid off, and the referendum was defeated. All told, in just under three years, FirstEnergy had paid a total of $61 million in bribes and illegal campaign contributions to secure the HB6 legislation.

6.       One year after HB6 was signed into law, the public learned exactly how FirstEnergy was able to secure the legislation. On July 17, 2020, the U.S. Attorney for the Southern District of Ohio filed an 80-page criminal complaint and affidavit (the "Criminal Complaint" or "FBI

Affidavit") against two of FirstEnergy's lobbyists, Speaker Householder, and multiple members of Householder's staff. In announcing the Criminal Complaint and indictments, U.S. Attorney David DeVillers stated that "*[t]his is likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio. This was bribery, plain and simple. This was quid pro quo*." Chris Hoffman, FBI, Special Agent in Charge of the investigation, described the scheme as a "shameful betrayal" and a "*sophisticated criminal conspiracy to enact legislation on behalf of Corporation A*"—widely acknowledged as FirstEnergy itself. In fact, DeVillers all but confirmed FirstEnergy's direct involvement, stating: "Company A provided $60 million in return for the $1.3 billion bailout. *Everyone in this room knows who Company A is*." While DeVillers noted that "no one from the Company has *of yet* been charged," he added that "there are going to be a lot of busy FBI agents in the Southern District of Ohio . . . *this is by no means over*."

7.     The Criminal Complaint confirmed the damning details of the scheme step-by-step, including the fact that Defendants either knew of and participated in the fraud, or willfully disregarded the significant and pervasive red flags that should have alerted them to the staggering corruption that the Company was directly funding. Indeed, the Criminal Complaint meticulously catalogued evidence that directly implicated FirstEnergy and Defendants, including detailed transcripts of phone calls, recorded conversations, call logs, text messages, meeting minutes and bank records. In fact, the Criminal Complaint detailed that various senior FirstEnergy executives held over 200 phone calls with Householder during the Relevant Period, including at least 84 calls with FirstEnergy CEO and Director, Defendant Charles E. Jones, as well as a meeting where Defendant Jones and other "Company brass" discussed defeating the HB6 ballot referendum. Additionally, virtually all of the funds wired to Householder and his cohorts were effectuated through FirstEnergy Service Company, a subsidiary that was under the control and management

of CEO Jones. Accordingly, the volume and specificity of evidence included in the Criminal Complaint confirmed the extent to which Defendants were directly implicated in the conspiracy.

8.     The facts, which continue to emerge, also demonstrate that Defendants consciously ignored pervasive and obvious red flags for years concerning the criminal conduct and the Company's ties to Householder, including persistent and widespread public scrutiny over Householder's ignominious past. Indeed, Former Ohio Secretary of State Ken Blackwell had publicly called Householder "the prince of darkness" for the reputational damage that Householder's prior actions had wrought on the state legislature. While Householder's suspicious past was widely reported throughout Ohio, that did not stop Defendants from seeking out Householder's assistance in securing the passage of HB6. Similarly, one of the lobbyists that FirstEnergy assigned to serve as a key middleman in the scheme, Matthew Borges—who would also later be indicted alongside Householder—had also pled guilty for illegal campaign contributions in a similar public pay-to-play scandal in 2004. Borges would later describe the convergence of FirstEnergy, Householder, and Borges' firm as an "unholy alliance."

9.     Moreover, throughout the Relevant Period, media articles, investigative journalists and public sector watchdogs repeatedly questioned the propriety of FirstEnergy's ties to Householder—intense scrutiny of which Defendants were well aware. For example, as early as 2017, media reports described FirstEnergy's relationship with Householder as "cozy" and "warm," and a March 2017 *Dayton Daily News* article highlighted Householder's history of alleged kickbacks and juxtaposed those past allegations with his suspicious trip aboard FirstEnergy's corporate jet to President Trump's inauguration. In April 2018, a *Cleveland.com* article questioned the "big checks" that FirstEnergy was providing to Householder and his allies, asking "***why FirstEnergy decided to put so much money behind Team Householder***." Notably, the article only

5

referenced FirstEnergy's publicly-reported donations of $154,000, as opposed to the millions of undisclosed bribes that FirstEnergy was surreptitiously funneling to Householder-controlled entities. Similarly, a July 2018 *Cleveland.com* article noted that a "pro-Householder" group had "raised $1 million from a single donor"—the Householder-controlled Generation Now.

10.     The public scrutiny of FirstEnergy only intensified as HB6 was introduced and passed. Indeed, media reports made the direct connection between the "unprecedented" amount of money being spent in the effort to pass HB6 and FirstEnergy's direct interest in the bill. For instance, an Ohio energy watchdog group called Common Cause Ohio released a report entitled "Connecting the Dots: FirstEnergy Political $$$, Profits, and Utility Policy." The report emphasized FirstEnergy's ties to Householder-related travel, lobbying and "secret money"; directly linked FirstEnergy's contributions and various Householder-affiliated "dark money" groups listing Generation Now as a donor; and highlighted the fact that the Company "***spent big to elect candidates—then got favorable policies in return***," including "taxpayer [funded] bailouts and rollbacks of energy efficiency standards." Significantly, the report directly asked the question that Defendants should have explored and redressed years earlier: "***whether FirstEnergy is using secret money to build public pressure this year***." Similarly, an article published in the *Cincinnati Enquirer* on July 2, 2019 asked, "Who paid all that money to buy all those nuclear bailout ads raining on Ohio?" The article quoted Householder as absurdly answering that the "working men and women from Ohio" paid for the advertisements. Despite the prevalence of these media reports and the persistent (and appropriate) questions being asked by investigative journalists, Defendants utterly failed to take any tangible action to address and correct the criminal misconduct.

11.     Furthermore, Defendants' failure to heed these obvious warning signs was even more conspicuous given the fact that the FirstEnergy Board of Directors had repeatedly defeated

shareholder proxy proposals directly aimed at enhancing transparency and accountability in the very areas implicated in the criminal scheme: FirstEnergy's lobbying efforts and the enterprise-level risk associated with such activities. For instance, in April 2015, a shareholder proposal raised concerns to the Board regarding FirstEnergy's mission-critical "decision-making process and oversight mechanisms for making lobbying contributions." A May 2016 proposal also identified the Board's oversight deficiencies, stating that "FirstEnergy previously committed to greater transparency around its political spending . . . but has not fulfilled its commitment." In March 2017—the same month that FirstEnergy provided the first $250,000 bribe to Householder—a shareholder proposal warned that "FirstEnergy's current lack of trade association disclosure presents reputational risk. ***Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests***." Despite these vociferous and repeated shareholder warnings, the proxy proposals were all defeated at the behest of the Board's recommendations.

12.     In short, Defendants willfully, repeatedly and brazenly failed to serve the best interests of FirstEnergy and its shareholders. As a result of Defendants' misconduct, FirstEnergy has and will continue to suffer massive damages and now faces a deeply uncertain future, including civil and criminal penalties, fines and legal liabilities. Indeed, immediately after the Criminal Complaint was publicly announced, FirstEnergy's stock price plummeted by 45%, wiping out billions of dollars in shareholder value that is now the subject of a securities class action.

13.     Defendants are liable to FirstEnergy for breaches of their fiduciary duties, insider trading, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and other violations of state law. Accordingly, Defendants face a substantial likelihood of liability

for their misconduct, such that they cannot make an objective decision to bring claims for damages that they have caused to the Company.

## II.   JURISDICTION AND VENUE

14.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.   Venue is proper in this Court because the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, and FirstEnergy has suffered and will continue to suffer harm in this District. Multiple putative class actions alleging violations of the federal securities laws are pending in this District, including *Owens v. FirstEnergy Corp., et al.*, No. 2:20-cv-03785 (S.D. Ohio) and *Frand v. FirstEnergy Corp. et al.*, No. 2:20-cv-04287 (S.D. Ohio) (the "Securities Class Actions").  Also, two shareholder derivative actions are pending in this district, *Bloom, et al. v. Anderson, et al.*, No. 1:20-cv-04534-SDM-KAJ (S.D. Ohio) and *Stavely v. Anderson et. al.,* 2:20-cv-04598 (S.D. Ohio).  In addition, the Criminal Complaint is pending in this District, as are two civil litigations against the Company for the complained of scheme by Ohio ratepayers, *Smith v. FirstEnergy Corp.*, et al., 2:20-cv-3755 (S.D. Ohio) and *Buldas v. FirstEnergy Corp., et al.,* 1:20-cv-00593 (S.D. Ohio).

## III.   PARTIES

### A.   Plaintiff

16.   Plaintiff Employees Retirement System of the City of St. Louis ("St. Louis") is a public pension system organized for the benefit of current and retired public employees of the city of St Louis, Missouri. As of August 2020, St. Louis had pension assets under management of approximately $800 million.

17. Plaintiff brings this action derivatively on behalf and for the benefit of FirstEnergy to redress injuries FirstEnergy suffered, and will suffer, as a direct result of Defendants' misconduct. FirstEnergy is named as a Nominal Defendant solely in a derivative capacity. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in this litigation.

18. Plaintiff has owned FirstEnergy common stock throughout the Relevant Period and remains a current stockholder of the Company. Plaintiff intends to retain shares in FirstEnergy throughout the duration of this litigation.

### B. Nominal Defendant

19. Nominal Defendant FirstEnergy Corporation ("FirstEnergy" or the "Company") is incorporated under the laws of Ohio and headquartered at 76 South Main Street, Akron, Ohio 44308. FirstEnergy is an electric utility involved in the distribution, transmission, and generation of electricity, as well as energy management and other related services. The Company is one of the largest investor-owned utilities, serving more than six million customers across the Midwest and Mid-Atlantic regions. FirstEnergy, through its subsidiaries, also owned and operated two nuclear power plants in the State of Ohio: the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station (the "Nuclear Power Plants").

20. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FE." FirstEnergy has more than 540 million shares of common stock outstanding.

### C. The Individual Defendants

#### 1. The Director Defendants

21. Defendant Charles E. Jones ("Jones") has served as Chief Executive Officer ("CEO") and Director of FirstEnergy throughout the Relevant Period and since 2015. Defendant

Jones previously held various management and senior management positions with the Company or its subsidiaries since at least 1978. In 2016, FirstEnergy paid Jones $14,117,750 in total compensation; his base salary was $1,133,840. In 2017, Jones' total compensation was $15,281,885; his base salary was $1,136,113. In 2018, Jones' total compensation was $11,123,128, and his base salary remained $1,136,113. In 2019, Jones' total compensation was $14,684,659, and his base salary remained $1,136,113. From 2016 to 2019, Jones' total compensation was $55,207,422. Jones is a named defendant in the Securities Class Actions.

22.     Defendant Michael J. Anderson ("Anderson") has served as a Director of FirstEnergy since 2007. Anderson is also the Chair of the Audit Committee and member of the Finance Committee. From at least 2016 through 2019, Anderson was on the Corporate Governance and Corporate Responsibility Committee. From 2016 to 2019, Anderson was awarded $1,031,757 in fees, stock awards, and other compensation for his service on the Board.

23.     Defendant Steven J. Demetriou ("Demetriou") has served as a Director of FirstEnergy since 2017 and is a member of the Finance and Operations, Safety and Nuclear Oversight Committees. Demetriou was on the Compensation Committee from 2018 through 2019. From 2017 through 2019, Demetriou was given $704,538 in fees, stock awards, and other compensation for his service on the Board.

24.     Defendant Julia L. Johnson ("Johnson") has served as a Director of FirstEnergy since 2011. Johnson is also the Chair of the Corporate Governance and Corporate Responsibility Committee and a member of the Finance Committee. From 2016 through 2019, Johnson was given $953,825 in fees, stock awards, and other compensation for her service on the Board.

25.     Defendant Donald T. Misheff ("Misheff") has served as a Director of FirstEnergy since 2012 and has been the Non-executive Chairman of the FirstEnergy Board since May 2018.

Misheff is also a member of the Audit and Corporate Governance and Corporate Responsibility Committees. Misheff served on the Compensation Committee from 2016 through 2018. From 2016 to 2019, Misheff was given $1,224,230 in fees, stock awards, and other compensation for his service on the Board.

26.     Defendant Thomas N. Mitchell ("Mitchell") has served as a Director of FirstEnergy since 2016. Mitchell is also the Chair of the Operations, Safety and Nuclear Oversight Committee and a member of the Corporate Governance and Corporate Responsibility Committee. From 2016 to 2019, Mitchell was given $978,193 in fees, stock awards, and other compensation for his service on the Board.

27.     Defendant James F. O'Neil, III ("O'Neil") has served as a Director of FirstEnergy since 2017. O'Neil is also the Chair of the Compensation Committee and a member of the Operations, Safety and Nuclear Oversight Committee. He was also on the Audit Committee from May 2017 to May 2019. From 2017 through 2019, O'Neil was given $739,825 in fees, stock awards, and other compensation for his service on the Board.

28.     Defendant Christopher D. Pappas ("Pappas") has served as a Director of FirstEnergy since 2011. Pappas is also the Chair of the Finance Committee and member of the Compensation Committee. From 2016 through 2019, Pappas was given $1,009,482 in fees, stock awards, and other compensation for his service on the Board.

29.     Defendant Sandra Pianalto ("Pianalto") has served as a Director of FirstEnergy since 2018 and is a member of the Compensation and Audit Committees. She also served on the Finance Committee from 2018 through 2019. From 2018 through 2019, Johnson was given $452,838 in fees, stock awards, and other compensation for her service on the Board.

30. Defendant Luis A. Reyes ("Reyes") has served as a Director of FirstEnergy since 2013 and is a member of the Corporate Governance and Corporate Responsibility Committee and Operations, Safety and Nuclear Oversight Committee. From 2016 to 2019, Reyes was given $948,601 in fees, stock awards, and other compensation for his service on the Board.

31. Defendant Leslie M. Turner ("Turner") has served as a Director of FirstEnergy since 2018 and is a member of the Audit and Compensation Committees. From 2018 through 2019, Turner was given $314,836 in fees, stock awards, and other compensation for her service on the Board.

32. Defendant Paul T. Addison ("Addison") served as a director of the Company and a member of the Board's Audit Committee from 2003 until May 21, 2019. Between 2017 and 2019, the Company paid Addison total compensation of $604,409 ($264,863 fees, $328,333 stock awards, and $11,213 change in pension value and nonqualified deferred compensation earnings).

33. Defendant Jerry Sue Thornton ("Thornton") served as a director of the Company between 2015 and May 21, 2019. Between 2017 and 2019, the Company paid Thornton total compensation of $567,146 ($228,813 fees, $328,333 stock awards, and $10,000 other compensation).

34. Defendant William T. Cottle ("Cottle") served as a director of the Company and a member of the Board's Governance Committee from 2003 until May 15, 2018. During 2017 and 2018, the Company paid Cottle total compensation of $354,406 ($139,099 fees, $185,376 stock awards, and $29,931 change in pension value and nonqualified deferred compensation earnings).

35. Defendant George M. Smart ("Smart") served as a director of the Company between 1997 and May 15, 2018, a member of the Board's Audit Committee from at least 2003 until May 15, 2018, and a member of the Governance Committee from at least 2005 until May 15,

2018. During 2017 and 2018, the Company paid Smart total compensation of $594,196 ($337,832 fees, $185,376 stock awards, $34,163 change in pension value and nonqualified deferred compensation earnings, and $36,825 other compensation).

36.     Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Turner, Addison, Thornton, Cottle, and Smart are collectively referred to herein as the "Director Defendants."

### 2.     The Officer Defendants

37.     Defendant Justin Biltz ("Biltz") was the Director, State Regulatory Affairs – Ohio for FirstEnergy between May 2016 and August 2018, and has been Director, State & Federal Regulatory Affairs since then.

38.     Defendant Michael J. Dowling ("Dowling"), is FirstEnergy's Senior Vice President, External Affairs. Dowling is responsible for FirstEnergy's local, state and federal Governmental Affairs; Energy Policy; State Regulatory Affairs and Market Policies; Economic Development; Corporate Affairs and Community Involvement, and the FirstEnergy Political Action Committee. He previously held various positions with the Company or its subsidiaries since at least 1986. In 1990, Dowling joined the Governmental Affairs Department. Dowling was promoted to vice president of Governmental Affairs in 2005. In 2008, he was named vice president, Communications and promoted to vice president, External Affairs in 2010. He was named to his current position in 2011.

39.     Defendant James F. Pearson ("Pearson") served as FirstEnergy's CFO from 2013 until March 2018. Pearson then transitioned to Vice President of Finance until his retirement in April 2019. He previously held various positions, including management positions, with the Company or its subsidiaries since at least 1976. In 2016, FirstEnergy paid Pearson $5,670,945 in total compensation; his base salary was $659,884. In 2017, Pearson's total compensation was

$5,977,966; his base salary was $662,214. In 2018, Pearson's total compensation was $3,895,599, and his base salary was $662,214. In 2019, Pearson's total compensation was $7,258,952, and his base salary was $161,471. From 2016 to 2019, Pearson's total compensation was $22,803,462. Pearson is a named defendant in the Securities Class Actions.

40.    Defendant Steven E. Strah ("Strah") is the President of FirstEnergy. Strah previously served as FirstEnergy's Chief Financial Officer ("CFO") from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He previously held various positions with the Company or its subsidiaries, since at least 1984, including a variety of management and senior management positions. In 2016, FirstEnergy paid Strah $3,342,359 in total compensation; his base salary was $553,286. In 2017, Strah's total compensation was $3,976,975; his base salary was $561,539. In 2018, Strah's total compensation was $3,495,512, and his base salary was $594,835. In 2019, Strah's total compensation was $6,034,128, and his base salary was $643,599. From 2016 to 2019, Strah's total compensation was $16,848,974. Strah is a named defendant in the Securities Class Action.

41.    Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from Defendant Strah, who he reports to. Prior to assuming this position, he was the Company's Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, Vice President of Utilities Operations. Taylor joined FirstEnergy in 2009 and progressed through various senior level financial positions. Taylor is named as a defendant in the Securities Class Action.

42.    Defendant Robert Reffner ("Reffner") is FirstEnergy's Senior Vice President and Chief Legal Officer, with responsibility for Legal, Corporate Secretary, Ethics, Risk and Internal

Auditing, and the Innovation Center. Reffner reports to Defendant Jones. Reffner joined FirstEnergy in 2007 and was elected senior vice president and general counsel in 2018. Reffner's total 2019 compensation was $2,467,891 and his base salary was $537,594.

43.     Defendant Ebony Yeboah-Amankwah ("Yeboah-Amankwah") is FirstEnergy's Vice President, General Counsel and Chief Ethics Officer, reporting to Reffner. Yeboah-Amankwah joined FirstEnergy in 2005 and was named vice president, deputy general counsel, corporate secretary and chief ethics officer in 2018. She was promoted several times in the Legal Department, developing expertise in the area of state regulatory affairs. She joined the External Affairs Department in 2011 as executive director of State Affairs supporting legislative and regulatory matters before returning to the Legal Department in 2012 as executive director, State and Federal Energy Regulatory Commission Legal Affairs. Yeboah-Amankwah advanced to vice president, State and Federal Regulatory Legal Affairs in January 2017.

44.     Defendants Biltz, Dowling, Jones, Pearson, Strah, Taylor, Reffner, and Yeboah-Amankwah are collectively referred to as the "Officer Defendants."

45.     Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Dowling, Turner, Reffner, Strah, Biltz, Taylor, Pearson, and Yeboah-Amankwah are collectively referred to herein as the "Defendants."

### D.     Relevant Non-Parties

46.     Larry Householder ("Householder") has been a member of the Ohio House of Representatives since January 2017 and was Speaker of the House from January 2019 until his removal on July 30, 2020. Householder previously was a House member representing Ohio's 72nd District from 1997 to 2004 and served as Ohio Speaker of the House from 2001 to 2004, before resigning after reports of alleged corrupt activity surfaced in the media and were publicly referred to the FBI. Householder personally benefitted from FirstEnergy as at least $300,000 in bribes were

used to pay his legal fees and settle a lawsuit against him; over $100,000 paid for costs associated with his Florida home; and $97,000 went to campaign related expenses.

47.     Generation Now ("Generation Now") is registered as a 501(c)(4), which is an IRS designation for a tax-exempt, social welfare organization. Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection. From 2017 to the present, Generation Now received approximately $60 million from FirstEnergy and its affiliates.

48.     Matthew Borges ("Borges") is a registered lobbyist for FirstEnergy Solutions ("FES"), a FirstEnergy subsidiary. Borges was a key middleman between FirstEnergy and Generation Now and was at the center of the effort to thwart the referendum opposing HB6. Borges received $1.62 million in wire transfers from Generation Now, according to the FBI Affidavit. Borges also paid himself over $350,000 from FirstEnergy to Generation Now proceeds. Borges called FirstEnergy's flow of funds to Generation Now "Monopoly money."

49.     Juan Cespedes ("Cespedes") is a multi-client lobbyist whose services were retained by FES. Cespedes was central to FES' efforts to get the bailout legislation passed in Ohio as records show that Cespedes was the listed "lead consultant" relating to FES' attempts to pursue legislation that would save the failing Nuclear Power Plants. According to the FBI Affidavit, Cespedes "was in regular contact with both [FirstEnergy] and Enterprise members during the relevant period." Cespedes received $227,000 from FirstEnergy in 2019 and approximately $600,000 from the Enterprise. The FBI Affidavit further states that, "supported by toll records and search warrant returns, Cespedes coordinated the timely payment of $15 million from [FirstEnergy] to Generation Now."

50.     Jeffrey Longstreth ("Longstreth") is Householder's longtime campaign and political strategist and instrumental to the Enterprise's efforts to pass HB6. According to the Criminal Complaint, "Longstreth led the messaging efforts both in the campaign to pass HB6 and to defeat the referendum, and was a point of contact for [FirstEnergy]." Longstreth personally benefitted from FirstEnergy to the tune of $5 million, including at least $1 million that he transferred to his brokerage account in January 2020.

51.     Neil Clark ("Clark") who owns Grant Street Consultants and was previously a budget director for the Ohio Republican Caucus, is a longtime lobbyist. Clark served as Householder's "'proxy' relating to [FirstEnergy's] matters" and in the Enterprise's efforts to further the enactment of HB6 and ensure HB6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Clark also communicated directly with House members to further the Enterprise. Clark stated that FirstEnergy operated as the Enterprise's "Bank" as the Company's "deep pockets" allowed funds to be "unlimited." Clark personally benefitted from FirstEnergy, receiving at least $290,000.

52.     Householder, Longstreth, Clark, Borges, Cespedes, and Generation Now are collectively referred to as the "Enterprise" as that term is defined in ¶8 of the FBI Affidavit.

## IV.     FIRSTENERGY'S DIRECT INVOLVEMENT IN THE OHIO BRIBERY SCHEME

### A.     Background of FirstEnergy and the Company's History of Corporate Governance and Oversight Failures

53.     FirstEnergy is a utility company incorporated under Ohio law that generates, transmits, and distributes electricity through its subsidiaries and affiliates. It is one of the nation's largest investor-owned electric systems. The Company's current core business segments are Regulated Distribution, comprising 85% of its revenues, and Regulated Transmission, comprising 15% of its revenues. The Regulated Distribution segment distributes electricity through

FirstEnergy's ten utility operating companies, serving approximately 6 million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York. The Regulated Transmission segment transmits electricity through transmission facilities owned and operated by certain of FirstEnergy's subsidiaries and affiliates.

54.     FirstEnergy also owns and operates FirstEnergy Service Co. ("FESC"), a principal subsidiary that provides legal, financial, and other corporate support to its affiliated companies. FESC does not have its own CEO or board of directors, and was under the control and management of FirstEnergy and Defendants at all times during the Relevant Period.

55.     During the Relevant Period, FirstEnergy had a third business segment, known as Competitive Energy Services ("CES"). CES itself was primarily comprised of three legal entities: FirstEnergy Solutions ("FES"), FirstEnergy Nuclear Operating Co. ("FENOC"), and Allegheny Energy Supply. Relevant here, through FES and FENOC, FirstEnergy owned, operated, and maintained two nuclear power plants in Ohio: the Perry Nuclear Generating Station (the "Perry Plant") and the Davis-Besse Nuclear Power Station (the "Davis-Besse Plant").[2] It was the deterioration in value of these two plants that led to the bribery scandal. Among the shared services FESC provided to FES were "external affairs," including "corporate contributions," as well as "advocacy at the Federal, State, and Local Levels."

56.     In addition to being one of the country's largest investor-owned electric systems, FirstEnergy is also one of the most controversial. Since at least 2003, FirstEnergy's long history

---

[2] Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively. Energy Harbor Corp. emerged from bankruptcy on February 27, 2020. Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6 as detailed herein.

of major corporate governance and oversight failures have subjected the Company to tens of millions of dollars' worth of liability for its repeated violations of shareholder and public trust, including:

      a.    A joint U.S.-Canadian investigation, led by the U.S. Secretary of Energy and Canada's Minister of Natural Resources, faulted FirstEnergy for the August 2003 power blackout that cut off power to 50 million people in the U.S. and Canada, led to nearly 100 deaths, and resulted in economic damages as high as $10 billion, finding that FirstEnergy bore overwhelming responsibility for the blackout for violating operating guidelines due to "long-standing institutional failures and weaknesses" that "could have been prevented."[3]

      b.    In 2004, FirstEnergy bribed Robert Tongren, then-Executive Director of Ohio's Office of Consumers' Counsel, a total of $2,000 in exchange for Tongren's agreement to destroy an unpublished consultant report. The unpublished report disputed FirstEnergy's claim that it should recoup up to $8.8 billion from ratepayers for its nuclear power plants, finding instead that the appropriate amount was between $2.2-$4 billion—a staggering difference of $4.8-$6.6 billion. The relationship between FirstEnergy and

---

[3] U.S.-Canada Power System Outage Task Force, "Final Report on the August 14, 2003 Blackout in the United States and Canada: Causes and Recommendations," (Apr. 2004), available at https://www.energy.gov/sites/prod/files/oeprod/DocumentsandMedia/BlackoutFinal-Web.pdf; Dan Shingler, "Crain's Look Back: 2003 blackout was a dark day for FirstEnergy — and many others," *Crain's Cleveland Business* (Aug. 9, 2020), available at https://www.crainscleveland.com/energy-and-environment/crains-look-back-2003-blackout-was-dark-day-firstenergy-and-many-others.

Tongren eventually came to light and under pressure from state officials and consumer groups, Tongren resigned.[4]

      c.      In 2006, FirstEnergy admitted "full [] responsibility" and paid a record $28 million fine to avoid being criminally prosecuted for lying to the government about the dangerous conditions at FirstEnergy's Davis-Besse Plant. Assistant Attorney General Sue Ellen Wooldridge of the Department of Justice's Environmental and Natural Resources Division announced that "[b]y misleading the N[uclear] R[egulatory] C[ommission] about its prior safety inspections, FENOC failed to meet its regulatory obligations and violated the public's trust." Specifically describing how FirstEnergy acted with "brazen arrogance," the government uncovered damning evidence that FirstEnergy had known for years that loose acid had melted away much of the nuclear reactor's protective cap—leaving less than an inch of protection preventing the reactor from bursting and causing a nuclear disaster akin to that at Three Mile Island in March 1979.[5]

57.      Accordingly, by the start of the Relevant Period, Defendants knew full well that FirstEnergy suffered from a decades-long history of corporate governance and oversight failures that had the potential to cause massive damages to the Company and its shareholders.

---

[4] "Consumer watchdog on Ohio utility's leash?" The Blade (Mar. 24, 2004), available at https://www.toledoblade.com/State/2004/03/24/Consumer-watchdog-on-Ohio-utility-s-leash.html.

[5] "FirstEnergy Nuclear Operating Company to Pay $28 Million Relating to Operation of Davis–Besse Nuclear Power Station," Department of Justice (Jan. 20, 2006), available at https://www.justice.gov/archive/opa/pr/2006/January/06_enrd_029.html; "NRC Statement on Justice Department Davis-Besse Action," U.S. Nuclear Regulatory Commission (Jan. 20, 2006), available at https://www.nrc.gov/docs/ML0602/ML060200180.pdf.

**B.    Amidst a Grim Outlook, FirstEnergy Turns to Shady Backroom Deals, Despite Investor Demands for Increased Transparency**

58.    By 2016, FirstEnergy's competitive nuclear generation operation had become financially unsustainable. In its 2016 Form 10-K, FirstEnergy reported a number of problems that its CES segment was facing, including "continued depressed prices in the wholesale energy and capacity markets," and FES in particular, including "weak demand for electricity and anemic demand forecasts." FirstEnergy thus recorded a non-case pre-tax impairment charge of $800 million, recognized in 2Q 2016 "representing the total amount of goodwill at CES." In light of this write-down and the Company's inability to profitably compete in the nuclear electricity generation market, FirstEnergy announced in the 2016 Form 10-K that:

> Although FirstEnergy is targeting mid-2018 to exit from competitive operations, the options for the remaining portion of CES' generation are still uncertain, but could include one or more of the following:
>
> - Legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits,
>
> - Additional asset sales and/or plant deactivations,
>
> - Restructuring FES debt with its creditors, and/or
>
> - Seeking protection under U.S. bankruptcy laws for FES and possibly FENOC.

59.    On the Company's earnings call the next day, February 22, 2017, Jones expanded on what "legislative solution" FirstEnergy was considering specifically for the Perry and Davis-Besse Plants: a bailout, sponsored by the state of Ohio.  The Company's first attempt was proposing the creation of a zero-emission credit. Jones explained:

> ***In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero-emission nuclear program is expected to be introduced soon.*** The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation

21

would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.

**_We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets._** We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

60.     Analysts at *Jefferies* said the zero-emission credit would "help keep Ohio nuclear plants in operation during these times of low power prices" and "provide $300 million of annual cash flow."

61.     Additionally, Jones discussed FirstEnergy's continued support of FES (and its subsidiary FirstEnergy Nuclear Generation) and its efforts to obtain subsidies:

In addition to the $500 million credit facility provided to FES by FirstEnergy that provides for ordinary operating liquidity needs, FirstEnergy is now working with FES to establish conditional credit support on terms and conditions to be agreed upon for the $400 million FES parental support agreement that is currently in place, benefiting FE Nuclear Generation. As always, the continued safe operation of these nuclear assets is of utmost importance and is consistent with our pursuit of environmental credits for the assets through a ZEN program.

62.     Notably, FirstEnergy's resort to "legislative solution[s]" alarmed both investors and corporate governance accountability watchdogs. Indeed, in the lead-up to the Relevant Period, two nonprofit research organizations dedicated to corporate governance and accountability—the Investor Responsibility Research Center Institute ("IRRCI") and the Center for Political Accountability—noted that of the top 25 electric utilities in the U.S., FirstEnergy had the second highest level of political spending relative to its revenues, yet ranked number 22 in transparency surrounding political spending.

63.     Accordingly, in the Company's 2015 annual proxy, a shareholder proposal was included that would have required FirstEnergy to prepare an annual report disclosing its lobbying expenditures (the "2015 Proposal"). In support, the shareholders behind the 2015 Proposal noted

that, despite FirstEnergy agreeing "to report annually on its political campaign contributions" in 2007, "FirstEnergy has not disclosed any record of its political spending" since 2009. The 2015 Proposal further noted that "shareholders are missing key information needed to assess our company's efforts to influence public policy" because FirstEnergy did not disclose "lobbying to influence legislation in states." The shareholders concluded that the Company's state of affairs posed a significant risk, warning that:

> ***Lobbying expenditures can undermine our company's reputation with consumers and the public***. In 2012, FirstEnergy faced significant public criticism for attempting to amend Ohio state energy efficiency regulations during the lame duck General Assembly session, without public hearings.[1] FirstEnergy also lobbied against proposals to limit industrial pollutants that threaten public health; FirstEnergy power plants are ranked among the top 10 most polluting in the nation.
>
> ***Shareholders are concerned that the company's social license to operate may be at risk if the company continues to lobby against interests of consumers and the public. Additional disclosure is needed for shareholders to assess whether lobbying expenditures are in the best interests of stockholders and long-term value.***

64. Eight days later, shareholder Green Century Capital Management ("Green Century") filed a Form PX14A6N with the SEC in further support of the 2015 Proposal, which placed further emphasis on transparency and oversight of the Company's lobbying activities. Green Century's filing began: "***Accountability and transparency in the use of . . . company funds to influence legislation, regulations and public policy is critical***," and noted that "[t]hird-party organizations estimate that FirstEnergy spends millions every year on lobbying to influence public policy, ***however the total actual amounts spent on the state and federal level are undisclosed by our company***. Consequently, shareholders do not have the information necessary to evaluate trends or risks associated with the Company's efforts to influence public policy, or whether these activities are in the best interest of shareholders."  In support of the 2015 Proposal, Green Century

23

stated, "FirstEnergy does not describe the company's decision-making process and oversight mechanisms for making lobbying contributions." The proposal continued:

> FirstEnergy does not detail its oversight mechanisms for lobbying decisions or rationales governing its lobbying expenditures, nor what the company's top lobbying priorities are and how they were chosen or may have shifted over time. Shareholders therefore have no way of knowing whether there are appropriate oversight mechanisms in place to ensure FirstEnergy's lobbying activities to influence the regulatory and legislative processes are in the best interest of the company and its shareholders.

65. Despite intense efforts to secure passage, the 2015 Proposal failed. Nevertheless, shareholders persisted, and included a proposal in FirstEnergy's 2016 Proxy that would have again required FirstEnergy to prepare a report disclosing its lobbying expenditures (the "2016 Proposal").

66. On May 5, 2016, shareholder Nathan Cummings Foundation filed a Form PX14A6N with the SEC in further support of the 2016 Proposal, which again emphasized FirstEnergy's "ineffective and risky" lobbying strategy as well as the Company's failure to provide transparency and oversight over its lobbying activities and the risks that these failures posed to the Company. The filing emphasized to shareholders that "***FirstEnergy previously committed to greater transparency around its political spending . . . but has not fulfilled its commitment***" and that "***inadequate disclosure by FE . . . present[s] significant risks*** . . . ." The Nathan Cummings Foundation also directly linked FirstEnergy's "***ineffective and risky [lobbying] strategy***" directly to its ageing and increasingly uncompetitive power plants, the Cummings Foundation noted that "FirstEnergy's lobbying efforts constitute an ineffective and risky strategy" citing a Federal Energy Regulatory Commission decision to overturn certain price controls relating to the purchase of power from FirstEnergy's Nuclear Power Plants.

67.     The filing also cited a report by the "IRRCI, a not-for-profit organization that funds environmental and corporate governance research, stating that FirstEnergy ranked second of the top 25 electric utilities in the U.S. for political spending relative to revenues.[6] This was troubling to shareholders, as the proposal also noted that the Center for Political Accountability ranked FirstEnergy 22 out of 25 utilities in political spending transparency.

68.     The April 2016 IRRCI report cited in the shareholder proposal examined the boards of the 25 largest U.S. investor owned utilities by revenue, evaluating sustainability reporting, corporate political activity and lobbying expenditures, and climate risk policy. The report highlighted the "[l]ongstanding public concern about the extent and nature of corporate political influence on elections and regulations" and that "[e]lection spending oversight and disclosure of direct expenditures from the corporate treasury has substantially increased since the turn of the decade." Notwithstanding the trend toward greater oversight, the report noted that in spite of FirstEnergy's rising political expenditures, the Company lacked transparency and Board oversight.

69.     The IRRCI report noted FirstEnergy had "far and away the most intensive political activity spending, which FirstEnergy's bumped up considerably between 2013 and 2014." Specifically, FirstEnergy spent almost $15 million from 2011 through 2015. However, this increased political spending was not accompanied by commensurate transparency or board oversight. The report found FirstEnergy to be among the companies "Most at Risk" in particular for the issues of "Corporate Political Activity Oversight & Disclosure" and "Political Spending and Public Policy Positions Disclosure," noting the Company's "high political spending intensity

---

[6] Sara Murphy, "The Top 25 U.S. Electric Utilities: Climate Change, Corporate Governance and Politics," *Investor Responsibility Research Center Institute* (Apr. 2016), available at https://www.weinberg.udel.edu/IIRCiResearchDocuments/2016/04/FINAL-Climate-Change-Corporate-Governance-and-Politics.pdf.

and no disclosure about their public policy positions." FirstEnergy also appeared near the bottom of a chart in the IRRCI report scoring each utility company by its oversight and disclosure functions, specifically due to the fact that—despite these repeated shareholder concerns—the Company maintained no Board oversight of, or disclosure of, spending on elections or lobbying.

70.     Despite another intense effort to secure passage, the Board recommended against the 2016 Proposal, and it failed. Nevertheless, shareholders persisted, and included a proposal in FirstEnergy's 2017 Proxy that would have again required FirstEnergy to prepare a report disclosing its lobbying expenditures (the "2017 Proposal").

71.     A shareholder proposal appearing in the Company's 2017 annual proxy, filed with the SEC on March 31, 2017, again put Defendants on notice "that FirstEnergy's current lack of trade association disclosure presents reputational risk. Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests."

72.     Despite another intense effort to secure passage, the 2017 Proposal also failed. Nevertheless, each of the 2015, 2016, and 2017 Proposals received an increasing amount of shareholder support, with the number of shares supporting the measure increasing from 60 million in 2015 to 133 million in 2017.

73.     Sensing that the tide was turning on this issue, the Board paid lip service to reform in 2018. In the 2018 annual proxy, filed with the SEC on March 30, 2018, the Board claimed that it sought shareholder feedback on its practices and disclosures concerning lobbying, stating that it had purportedly "enhanced" its oversight and disclosure function. The Board claimed that it "further strengthened its oversight of [the] Company's lobbying activities and amended the Corporate Governance Committee's Charter to clarify this responsibility." Notably, the Board stated that its "Corporate Governance Committee maintains an informed status with respect to the

Company's practices related to corporate political participation … ." The annual proxies in 2019 and 2020 simply stated:

> We have a decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance, Sustainability and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.
>
> Based on feedback from our shareholder engagement and outreach, we recently expanded our website disclosure to include reports on federal and state level lobbying, as well as, the lobbying portion of certain trade association dues.

74.     As detailed below, while Defendants were on notice of oversight issues related to political expenditures and lobbying, and even claimed to have a process in place for reviewing such expenditures, the Board utterly failed in their duty of oversight for several years, disregarding numerous red flags, media scrutiny, and concern from shareholders and expert analysts. In light of the fact that the Company's pursuit of "legislative solutions" was essential to its future success, the Company's internal controls and procedures related to lobbying and political contributions were mission-critical.  But Defendants' failure to stop the Company from funding and participating in a widespread, years-long criminal bribery scheme that subjected FirstEnergy to massive legal, business, and reputational harm and liabilities demonstrates that any purported oversight mechanisms related to political expenditures and lobbying were wholly illusory.

**C.      The      Director      Defendants      Consciously      Ignored      Persistent and Pervasive Red Flags as the Bribery Scheme Began**

75.     Despite its lobbying efforts, however, multiple attempts to obtain a "legislative solution" to FirstEnergy's fiscal problems failed to pass, including several proposals in 2017 contained in House Bill 178, Senate Bill 128, and House Bill 381.

27

76.     As FirstEnergy continued to search for a solution to its nuclear plant problems, politician Larry Householder was making his way back into the Ohio political arena. Householder was the disgraced former Speaker of the House, who left that position in 2004 under FBI investigation into allegations of money laundering, kickbacks from vendors and illegal campaign contributions in exchange for favorable legislation. The prior allegations and investigation of Householder were noted in a March 12, 2017 profile of Householder published in the *Dayton Daily News*, which quoted former Ohio Secretary of State Ken Blackwell urging Republican leaders to remove Householder as Speaker, and noting that the "scandal is the result of a political culture that is rapidly slouching into total darkness and a Speaker [Householder] who relishes being known as the prince of darkness."[7] The article further noted that "Householder is cozy with FirstEnergy," which should have immediately raised significant concerns among the Director Defendants, given the scope and magnitude of the past accusations against Householder of impropriety and illegality involving campaign contributions, and the known deficiencies in the Board's oversight over FirstEnergy's lobbying activities.

77.     In spite of his highly problematic past, Householder ran in, and won, the November 2016 election for the House seat in Ohio's 72nd District, which the FBI Affidavit described as the first step in Householder's strategy to be reelected as Speaker two years later, in 2019. This is because Members of the Ohio House of Representatives serve two-year terms and are term-limited to four consecutive terms. At the end of 2018, therefore, the then-current Speaker would be term limited, and a new Speaker would be named for the 2019 legislative session.

---

[7] Laura Bischoff, "Former Ohio House speaker Householder looking to return to power," *Dayton Daily News* (Mar. 13, 2017), available at https://www.daytondailynews.com/news/state--regional-govt--politics/former-ohio-house-speaker-householder-looking-return-power/7WQrEqoM0OWAoOuBvDZqdI/.

78. Consequently, the plan Householder and his co-conspirators hatched was to raise money and support "a team of electable candidates who would support Householder's bid for speakership."[8] Householder reassumed office on January 3, 2017 and *just days later*, Householder flew on FirstEnergy's private jet to Washington, D.C. to attend the presidential inauguration.[9]

79. The corrupt deal was struck. Matthew Borges, one of Householder's co-conspirators and a registered lobbyist for FES, later described it as the "unholy alliance between" FirstEnergy, Householder, and his own lobbying firm. Following this lavish trip, beginning in March 2017, Householder began receiving quarterly payments of $250,000 from FirstEnergy and FirstEnergy subsidiary FESC, into a bank account of an entity called Generation Now, a 501(c)(4) entity that Householder secretly controlled and that was incorporated just one month previously, in February 2017. Generation Now was intentionally structured to be as opaque as possible. As Neil Clark, a lobbyist and Householder's co-conspirator described it, Generation Now's structure allowed "donors" to "give as much or more to the (c)(4) and nobody would ever know."[10] Despite the omission Householder's name from the account, there can be no dispute that Householder was the true owner: Clark stated in a recorded conversation that "it's secret, a (c)(4) is secret. ***Nobody knows the money goes to the Speaker's account***. it is controlled by his people, one of his people, and its non-recorded. A (c)(4) is non-recorded." According to the FBI Affidavit, Clark later explained that "Generation Now is the Speaker's (c)(4)" and referred to Householder as "the overseer" of Generation Now.

---

[8] ¶70. (References to "¶__" are to the FBI Affidavit.)

[9] The *Dayton Daily News* reported that months after this flight, FirstEnergy still had not billed Householder for the trip, nor had he made an ethics disclosure regarding the trip.

[10] ¶45.

80.     At the same time Householder and his co-conspirators were working to secure Householders Speakership in 2019, FirstEnergy suffered two legislative defeats in 2017: HB 178, which would have allowed FirstEnergy to collect an additional $300 million annually from customers for zero emissions credits, and HB 381, which would have allowed FirstEnergy to charge customers about $2.50 more per month to subsidize the Davis-Besse and Perry nuclear power plants in northern Ohio.  When these measures failed to pass, the Company's future became even further entwined with Householder's plan to retake the Speakership.

81.     As the Company continued funding Generation Now, the agreement was clear: FirstEnergy would support the candidacies of Householder and his allies in the upcoming 2018 election, in exchange for the legislative relief that was crucial to the Company's future. From 2017 to 2018, Generation Now would spend about $3 million in money funneled from FirstEnergy to support the election bids of Householder and nearly two dozen different candidates friendly to Householder who would then vote for his elevation to Speaker. Indeed, most of these candidates won the 2018 general election; they all voted to name Householder as Speaker; and all but two eventually voted for FirstEnergy's bailout. FirstEnergy used FirstEnergy Service, as well as another entity it controlled, known in the FBI Affidavit as "Energy Pass-Through," to funnel these payments to Householder. Money that FirstEnergy paid to Generation Now was also used to pay for Householder's reelection staff (which otherwise would have been paid by Householder's candidate committee), which gave Householder a competitive edge over his opponents. Householder also used FirstEnergy's money, laundered through Generation Now, to purchase at least $97,000 worth of mail and radio advertisements in his district.

82.     Between the time when Generation Now's bank account was first opened in February 2017 and the 2018 general election, FirstEnergy funneled nearly $2.5 million into Generation Now:

| Date | Amount | Method | Funding Entity |
|------|--------|--------|----------------|
| March 16, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| May 17, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| August 10, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| December 8, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| March 15, 2018 | $300,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| May 4, 2018 | $100,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| August 8, 2018 | $54,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| August 16, 2018 | $500,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| October 9, 2018 | $400,000 | Check | FirstEnergy Service Co. |
| October 29, 2018 | $100,000 | Check | FirstEnergy Service Co. |
| **Total** | **$2,454,000** | | |

83.     Notably, the FBI Affidavit states that one-fifth of these payments—in the final month before the 2018 general election—were made through checks that were signed by the Senior Vice President and CFO for FESC, Defendant Strah , who is now President of FirstEnergy. In addition, FirstEnergy funneled an additional $500,000 to a dark money group associated with the Enterprise on October 29, 2018—bringing FirstEnergy's total illicit payments to $2,954,000.

84.     At the same time that FirstEnergy was funneling massive sums of money to Householder's allies through Generation Now, senior FirstEnergy Executives were in regular contact with Householder and his allies in furtherance of their illicit scheme. As the FBI Affidavit lays out, for example, prior to FirstEnergy's $300,000 payment to Householder on March 15, 2018,

31

there were multiple phone calls between the Enterprise and FirstEnergy executives that "corroborate the close relationship" between members of the Ohio bribery scheme:

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| March 12, 2018 | 2:03 pm | Householder | FESC SVP, External Affairs | 24 seconds |
| March 12, 2018 | 3:06 pm | FESC SVP, External Affairs | Householder | 3:03 minutes |
| March 12, 2018 | 3:11 pm | FESC SVP, External Affairs | Householder | 9 seconds |
| March 12, 2018 | 4:59 pm | Householder | FirstEnergy Ohio Director of State Affairs | 11:34 minutes |
| March 12, 2018 | 5:45 pm | FirstEnergy Ohio Director of State Affairs | Householder | 0 seconds |
| March 12, 2018 | 5:45 pm | FirstEnergy Ohio Director of State Affairs | Householder | 13 seconds |
| March 12, 2018 | 7:55 pm | Householder | FirstEnergy Ohio Director of State Affairs | 11:17 minutes |
| March 13, 2018 | 5:22 pm | FESC SVP, External Affairs | Householder | 1:32 minutes |
| March 13, 2018 | 5:24 pm | FESC SVP, External Affairs | Householder | 56 seconds |

85.     The FBI Affidavit lays out a similar pattern that occurred prior to FirstEnergy's May 4, 2018 payment of $100,000, which occurred just days prior to the 2018 primary elections:

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| April 27, 2018 | 10:49 am | FESC SVP, External Affairs | Longstreth | 0 seconds |
| April 27, 2018 | 10:49 am | FESC SVP, External Affairs | Longstreth | 3 seconds |
| April 27, 2018 | 10:55 am | Longstreth | FESC SVP, External Affairs | 2:47 minutes |

| April 27, 2018 | 1:37 pm | Longstreth | FESC SVP, External Affairs | 2:56 minutes |
| April 28, 2018 | 10:38 am | FESC SVP, External Affairs | Longstreth | 1:30 minutes |
| April 28, 2018 | 11:40 am | Longstreth | FESC SVP, External Affairs | 2:14 minutes |
| April 30, 2018 | 9:11 am | Longstreth | FESC SVP, External Affairs | 2:11 minutes |
| May 1, 2018 | 6:41 pm | FirstEnergy Ohio Director of State Affairs | Longstreth | 15:49 minutes |
| May 3, 2018 | 10:09 pm | FirstEnergy Ohio Director of State Affairs | Longstreth | Text message |
| May 4, 2018 | 6:10 am | Longstreth | FirstEnergy Ohio Director of State Affairs | Text message |
| May 4, 2018 | 6:18 am | FirstEnergy Ohio Director of State Affairs | Longstreth | Text message |
| May 4, 2018 | 6:25 am | Longstreth | FirstEnergy Ohio Director of State Affairs | 14:12 minutes |

86.    Additionally, on April 10, 2018, about a month before the 2018 Ohio primary elections, then-Speaker Cliff Rosenberger abruptly announced his resignation from the Speakership. Two days later, when that resignation became effective, the FBI Affidavit revealed that Householder called FESC's Vice President of External Affairs, while his co-conspirator Longstreth spoke with FirstEnergy's Ohio Director of State Affairs, presumed to be Defendant Biltz—leaving no doubt that FirstEnergy was inextricably tied to Householder's illicit conspiracy to retake the Speakership.

87.    These illicit payments were kept hidden from the public. By mid-2018, however, even FirstEnergy's publicly disclosed payments to Householder and his legislative allies were

33

drawing media attention—to say nothing of the millions of dollars that FirstEnergy was also illegally funneling through Generation Now. An April 20, 2018 *Cleveland.com* article entitled "FirstEnergy PAC writes big checks to House speaker hopeful Larry Householder, campaign allies" reported that state campaign records showed that FirstEnergy "donated more than $5,000 to [Householder] and a total of about $149,000 to more than a dozen other House candidates" who backed him for speaker.[11] Noting the 2017 inauguration flight and FirstEnergy's close ties with Householder, the article raised serious questions, stating, "[i]t's unclear exactly why FirstEnergy decided to put so much money behind Team Householder. But Householder has enjoyed a warm relationship with the company – last year, he and one of his sons used a FirstEnergy corporate plane to attend President Donald Trump's inauguration." FirstEnergy enjoyed the support of Householder and his allies, as they co-sponsored the failed House Bill 381, which would have allowed "FirstEnergy subsidiaries to charge customers about $2.50 more per month to subsidize the Davis-Besse and Perry nuclear power plants in northern Ohio."

88.     In spite of the implications of impropriety and illegality associated with a very real pay-to-play scheme that was already a year into operation when this article was published, Defendants took no action, while a Company spokesman "didn't directly say why the company's PAC made the contributions." The article was yet another red flag that should have caused Defendants to take tangible action to address the misconduct that was already well underway.

89.     In addition to media scrutiny, corporate watchdog groups also took notice of the influence of "dark money" in Ohio politics related to Householder and FirstEnergy policy

---

[11] Jeremy Pelzer, "FirstEnergy PAC writes big checks to House speaker hopeful Larry Householder, campaign allies," *Cleveland.com* (Apr. 20, 2018), available at https://www.cleveland.com/open/2018/04/firstenergy_pac_writes_big_che.html.

initiatives, and including the fact that one candidate who opposed Householder and FirstEnergy was punished by FirstEnergy-aligned entities.

90. On May 22, 2018, the Center for Public Integrity published an article in Slate and the *Columbus Dispatch* entitled "Negative Energy," which described how a candidate for Ohio state representative was targeted by a "dark money group" operated by a FirstEnergy lobbyist because of her opposition to the failed House Bill 178 (the zero emission credits bill that would have allowed FirstEnergy to collect an additional $300 million annually from customers).[12] When Christina Hagan, a candidate for an Ohio congressional seat, rebuffed FirstEnergy officials' attempts at lobbying her to support the bill, she said, "I became the target of [FirstEnergy] and the members of our leadership team who wanted to get it done but couldn't because I wasn't going to be supportive." In retaliation, a group called the Conservative Leadership Alliance spent $113,000 in her race and "targeted [Hagan] with a barrage of attack ads." Like Generation Now, the group was a 501(c)(4) "social welfare" nonprofit that spent large amounts of money to support FirstEnergy's policy goals. Additionally, the group's treasurer was Marc Himmelstein, "who has worked for years as a FirstEnergy lobbyist in Washington," and whose firm National Environmental Strategies had been paid $640,000 by FirstEnergy since 2010. Hagan connected the attacks to her opposition to FirstEnergy, stating, "I'm sure they just wanted to make an example of me in my race for higher office that if you don't play well, this is what will happen to you." Again, the Company failed to respond to questions on this matter. The *Slate/Columbus Dispatch* piece was another red flag that placed the Director Defendants on notice of the criminal conduct and the Company's direct connection to and funding of dark money groups.

---

[12] Sarah Kleiner, "Negative Energy" *Slate* (May 22, 2018), available at https://slate.com/news-and-politics/2018/05/christina-hagan-defied-energy-lobbyists-then-a-dark-money-group-helped-sink-her-campaign.html.

91.     On July 18, 2018, *Cleveland.com* published an article entitled "Dark money groups spent millions on Ohio legislative races," which discussed dark money funding of ads in Republican House primaries, including one "pro-Householder" PAC funded by Generation Now and supportive of the House Bill 381 subsidy of the Company's two nuclear plants.[13] The *Cleveland.com* article reported that the group, Growth & Opportunity PAC, "raised $1 million from a single donor—a social welfare group registered in Delaware called Generation Now." Growth & Opportunity used Generation Now, and thus FirstEnergy, money to promote House Bill 381, "which would subsidize two nuclear power plants in Ohio owned by FirstEnergy, the financially troubled utility company." The elements of the entire scheme were contained in this article, yet the Defendants failed to fulfill their oversight duties in investigating, identifying and redressing FirstEnergy's role in funding dark money groups, nor did they investigate or otherwise meaningfully address the Company's connection with Householder and Generation Now.

92.     As questions continued to swirl around the cozy relationship between FirstEnergy and Householder, the majority of the FirstEnergy-bankrolled and Householder-approved candidates won their primaries. And despite the significant questions raised by these articles, on August 1, 2018, Householder met with FirstEnergy executives in Columbus in furtherance of their scheme, to refocus their efforts on ensuring that Householder and his allies won the upcoming general election in November. According to the FBI Affidavit, later that month, FirstEnergy wired $500,000 to Generation Now, the first of $1.5 million of total payments to Generation Now between August and October 2018. In addition to that $1.5 million, on October 29, 2018,

---

[13] Andrew Tobias, "Dark money groups spent millions on Ohio legislative races," *Cleveland.com* (July 18, 2018), available at https://www.cleveland.com/open/2018/07/dark_money_groups_ spend_millio.html.

FirstEnergy funneled an additional $500,000 to a dark money group set up by Householder's co-conspirator Longstreth.

### D. The Director Defendants Consciously Ignored Further Red Flags Related to Householder and Generation Now as HB6 was Passed

93.     The FirstEnergy-backed scheme to elect Householder and his allies in the 2018 general election worked. Householder won his reelection bid and was named Speaker. Having secured the Speakership, Householder was now ready to pay FirstEnergy back by pursuing its legislative bailout. Householder's co-conspirator Clark aptly explained that Householder "went to war for [FirstEnergy]" after accepting millions from the Company because he was "pay-to-play."[14] In return, the Enterprise referred to FirstEnergy as the "Bank" "because they can do, they can fund these things for 20 years if they want to . . . They've got too much money. . . ."

94.     Indeed, Householder immediately began upholding his end of the bargain and returning favors to FirstEnergy. The very day that Householder was elected Speaker, he pledged to create a standing subcommittee on energy generation, which existed ***only*** to pass the forthcoming HB6, which was then introduced on April 12, 2019.[15] While titled "Ohio Clean Air Program," the FBI Affidavit explains that "HB6 essentially was created to prevent the shutdown of [FirstEnergy's] nuclear plants."[16] It would do this by creating a $9 subsidy per megawatt hour of energy produced by nuclear or solar generators. The subsidy would be funded by instituting a monthly fixed charge on all residential, commercial, and industrial consumers. The fixed charge was projected to produce $140 million in its first year, and $200 million per year thereafter. Given that FirstEnergy's nuclear plants produced over 18.3 million megawatts in 2018 alone (compared

---

[14] ¶183.

[15] "At an April 12, 2019 press conference, Householder admitted that HB6 "'*is why that Subcommittee was created*.'" ¶116.

[16] ¶111.

to just 1,095 megawatts produced by Ohio's six combined solar facilities), FirstEnergy would collect approximately 94% of the subsidy, which would total more than $160 million annually. Newspapers throughout Ohio derided HB6 as a "bailout" for the specific benefit of FirstEnergy.[17]

95.     Householder gave a press conference on April 12, 2019, the day that HB6 was introduced. When asked where the amount of the subsidy came from, Householder replied that "***for two years I've had this in my head***, and I've had various versions on that white board over the last several months." Notably, roughly two years prior to the introduction of HB6, FirstEnergy funneled its first $250,000 to Householder through Generation Now.

96.     As HB6 moved through various House committees and subcommittees, FirstEnergy bankrolled a media blitz to influence public opinion and pressure legislators to vote in favor of HB6. Significantly, the FBI Affidavit explained that FirstEnergy funded this entire media blitz, wiring $9.5 million to Generation Now in just April and May 2019 alone:

| Date | Amount | Method | Funding Entity |
|------|--------|--------|----------------|
| April 30, 2019 | $1,500,000 | Wire | FirstEnergy Service Co. |
| May 7, 2019 | $1,500,000 | Wire | FirstEnergy Service Co. |
| May 15, 2019 | $2,500,000 | Wire | FirstEnergy Service Co. |
| May 22, 2019 | $2,500,000 | Wire | FirstEnergy Service Co. |
| May 29, 2019 | $1,500,000 | Wire | FirstEnergy Service Co. |
| **Total** | **$9,500,000** | | |

97.     The evidence presented in the Criminal Complaint and the FBI Affidavit provide undeniable evidence of the criminal scheme and FirstEnergy's central role in it.  Indeed, text

---

[17] *See, e.g.,* Jessie Balmert, "Ohio House Passes Bill to Bail Out Nuclear Plants in Northern Ohio," *Cincinnati Enquirer* (May 29, 2019), available at https://www.cincinnati.com/story/news/politics/2019/05/29/ohio-house-passes-nuclear-plant-bailout/1270558001/; Tom Henry, "Bill That Would Rescue Nuclear Plans Drawing Protests Across Northern Ohio," *Toledo Blade* (June 3, 2019), available at https://www.toledoblade.com/local/environment/2019/06/03/Protesters-oppose-House-Bill-6/stories/20190603170.

messages from Juan Cespedes, one of FirstEnergy's lobbyists, to Longstreth state that FirstEnergy "approved $15M" in total for the media blitz:



98.    The FBI Affidavit concludes that the fact that FirstEnergy funded the entire campaign in favor of HB6 in the House, "is further evidence of the corrupt relationship" between the Company and Householder.

99.    During this time, numerous articles continued to question the connection between Householder and FirstEnergy, giving Defendants further notice that their "cozy relationship" was a pay-for-play scheme. One article and radio story published on April 15, 2019 by the Ohio radio station WKSU entitled "Proposed State Energy Policy Overhaul Influenced by Utility Company" questioned Householder about publicly disclosed donations he received from FirstEnergy and

whether those donations influenced his support for HB6, which benefited the Company.[18] The article noted that "FirstEnergy donated more than $150,000 to House Republicans during the 2018 election" and was then rewarded by Householder who was "pushing for a new energy plan that would steer about $170 million in subsidies to two nuclear plants owned by FirstEnergy Solutions, which used to be a subsidiary of FirstEnergy." While Householder dishonestly told WKSU that there was no connection between FirstEnergy's donations and his advocacy on the Company's behalf, in reality there was a direct connection, because FirstEnergy had by then funneled millions of dollars to Householder, his co-conspirators, and political allies to buy precisely the kind of support they were now receiving. Ignoring repeated red flags about the inappropriate relationship between the Company and Householder, and the obvious direct benefit of their activities to FirstEnergy, Defendants allowed the scheme to continue for another year after this article was published.

100.    On May 23, 2019, Common Cause Ohio, a watchdog group, issued a report entitled "Connecting the Dots: FirstEnergy Political $$$, Profits, and Utility Policy" discussing the unmistakable connection between the lobbying by FirstEnergy to pass HB6 and Generation Now's $1 million donation to Growth & Opportunity PAC to purchase advertising supporting the legislation.[19] The report called HB6 a "handout" to the Company that was "rushed through the process" of passage, a result made possible by FirstEnergy's secret payments to legislators. The report further inquired "whether FirstEnergy is using secret money to build public pressure this

---

[18] Andy Chow, "Proposed State Energy Policy Overhaul Influenced by Utility Company," *WKSU 89.7* (Apr. 15, 2019), available at https://www.wksu.org/post/proposed-state-energy-policy-overhaul-influenced-utility-company#stream/0.

[19] "Connecting the Dots: FirstEnergy Political $$$, Profits, and Utility Policy," *Common Cause Ohio* (May 23, 2019), available at https://www.commoncause.org/ohio/wp-content/uploads/sites/23/2019/05/OHIO-Connect-the-Dots.pdf.

year," and "how a pro-House Bill 6 tv advertisement is connected to FirstEnergy." As the FBI Affidavit has made clear, FirstEnergy was indeed using secret money to push HB6, and had a direct connection to the advertising, because it paid Generation Now to buy the advertising and conspired to hide its role behind Householder's dark money group.

101. Another article published on the same day by *Cleveland.com* reviewed "all the ways FirstEnergy and its allies have worked to get HB6 passed," including "well-placed campaign contributions, to lobbyist-engineered testimony, [and] millions of dollars in mysteriously funded TV and radio ads."[20] The article stated that FirstEnergy donated over a million dollars to Ohio political candidates since January 2017, including one donation of $12,700 "in free food and drinks" from Defendant Jones to now-Governor Mike DeWine. The article also detailed Generation Now's spending in support of FirstEnergy and HB6, including "$4.6 million worth of pro-HB6 radio and TV ads that have run across the state." One Republican ad consultant called Generation Now's multi-million-dollar ad campaign "unprecedented." The consultant seemed to acknowledge the connection between FirstEnergy and Generation Now, further observing, "Rarely if ever has a public affairs campaign aimed at a vote in the state legislature seen this level of TV spending in Ohio. The stakes are high for [FirstEnergy Solutions]. They need this taxpayer funded bailout to stay afloat, so no amount of money is probably too much for them to spend on this endeavor. Whether it will actually impact the vote remains to be seen." In truth, the advertising was not "mysteriously funded," but rather funded by the company that directly benefitted from it: FirstEnergy. Defendants once again were on notice of a dark money group spending

---

[20] Andrew Tobias, "Nuclear bailout bill shows how big money can be put to work in the Ohio Statehouse," *Cleveland.com* (May 23, 2019), available at https://www.cleveland.com/news/g66l-2019/05/ce7f1b02ee6954/nuclear-bailout-bill-shows-how-big-money-can-be-put-to-work-in-the-ohio-statehouse.html.

"unprecedented" amounts in support of the Company's desperately sought after legislative priority, and failed to employ its self-described "enhanced" oversight and disclosure functions to shed light on the same questions about Generation Now that so many media outlets and experts were asking at the time.

102.    HB6 passed the House on May 29, 2019.[21] As the FBI Affidavit notes, while the passage of HB6 in the House helped Householder maintain his agreement with FirstEnergy, it did not fulfill that agreement; rather, Householder needed to ensure that HB6 passed the Senate and was thereafter signed into law. That same day, FirstEnergy released a statement explaining that the bill was "an effective legislative solution to keep [FirstEnergy's] nuclear power plants open" and stating that "[u]ntil the Senate vote, [FirstEnergy] will continue to engage in a constructive dialogue with legislators . . . ." On June 3, 2019, in response to negative press coverage regarding HB6 passing the House, Householder co-conspirator Longstreth pulled the "whole HB6 team" together for a strategy session. Longstreth texted FirstEnergy lobbyist Cespedes, stating "Speaker has asked me to pull together the whole HB6 team on Monday. Are you available?" adding,

---

[21] After HB6 passed the House, FirstEnergy lost a previous attempt at bailing out its failing companies. On June 19, 2019, the Ohio Supreme Court overturned the Public Utilities Commission of Ohio's 2016 approval of a "Distribution Modernization Rider" that allowed FirstEnergy to collect an estimated $168 to $204 million in extra revenue per year in charges to its customers as incentive to modernize the distribution systems of its companies Ohio Edison Company, the Cleveland Electric Illuminating Company, and the Toledo Edison Company. *In re Ohio Edison Co.*, 157 Ohio St. 3d 73, 86, 131 N.E.3d 906 (Ohio 2019), reconsideration denied, 156 Ohio St.3d 1487. Following the decision, a spokesman for the Ohio Consumers Counsel – the state of Ohio's legal representative for residential utility consumers that sought review of the charges – noted that while FirstEnergy had lost this subsidy, "a couple blocks away from the court at the Statehouse, hearings are in progress on legislation (House Bill 6) supported by FirstEnergy . . . and others to charge millions of Ohioans even more money to subsidize nuclear and coal power plants. The utilities have too much influence in this state, and that needs to be reformed." Laura Hancock, "Ohio Supreme Court nixes FirstEnergy electric grid charge," *Cleveland.com* (June 19, 2019), available at https://www.cleveland.com/open/2019/06/ohio-supreme-court-nixes-firstenergy-electric-grid-charge.html.

"Speaker is on a rampage." Cespedes responded "Understood. Just let me know what I should be prepared for. I want to make sure I have answers and do not want the speaker's rage directed at me lol." Longstreth told Cespedes that Householder "was p*ssed" about a newspaper article, to which Cespedes replied "Aw f*ck. Sorry to hear that. *I've got your back. You have been great. Let's just regroup and get the rest of the deal done.*"

103.    Text messages recovered from Householder co-conspirator Jeffrey Longstreth showed "that [FirstEnergy] had budgeted for, and was paying for the costs associated with the campaign to pass HB6 through the Senate."[22] Less than a week after HB6 was introduced in the Senate, FirstEnergy wired $2 million to Generation Now, the first of what would eventually amount to nearly $7.4 million in illicit funds:

| Date | Amount | Method | Funding Entity |
|------|--------|--------|----------------|
| June 5, 2019 | $2,000,000 | Wire | FirstEnergy Service Co. |
| June 13, 2019 | $1,361,899 | Wire | FirstEnergy Service Co. |
| June 20, 2019 | $2,116,899 | Wire | FirstEnergy Service Co. |
| July 5, 2019 | $1,879,457 | Wire | First Energy Solutions |
| **Total** | **$7,358,255** | | |

104.    These laundered funds paid for numerous television commercials which the Enterprise targeted at individual Senators. Notably, as the FBI Affidavit explains, many of these commercials disclosed that they were "paid for by Generation Now"—another red flag that would have been immediately apparent to anyone meaningfully monitoring FirstEnergy's outgoing wire transfers to Generation Now.

105.    Investigative news articles continued to question the relationship between FirstEnergy and Householder as HB6 moved through the Senate. An article published on July 2,

---

[22] ¶152.

2019 in the *Cincinnati Enquirer* asked, "Who paid all that money to buy all those nuclear bailout ads raining on Ohio?"[23] The article reported that HB6, "which has the backing of powerful House Speaker Larry Householder, triggered up to $8.3 million in ads and other campaign spending," only $2.7 million of which was reported to the FCC, due to broadcasters choosing not to disclose the figures, which further obscured the sources of the funding.[24] According to the article, Generation Now was the primary financial backer of HB6, and that "while it's clear which candidates got the 'dark money' boosting the nuke plant bailout… it's uncertain who originally contributed it or the money that bought airtime." For his part, Householder offered that "working men and women from Ohio, who want to save their jobs" were "paying for these ads." The article explained that this statement was absurd: Generation Now's website contained no web portal to make individual donations. In truth, it was FirstEnergy that paid for everything, with the Company's contributions funneled through Generation Now to dark money organizations who then bought advertising. Defendants would no doubt have been aware of the pervasive TV and radio advertising, which should have raised questions to the Board about the advertising and the funding of Generation Now.

106.    Bankrolled by FirstEnergy, Householder's strategy worked. The Senate passed HB6 approximately one month after it was introduced and on July 23, 2019, the governor signed

---

[23] Josh Goad, "Who paid all that money to buy all those nuclear bailout ads raining on Ohio?" *The Cincinnati Enquirer* (July 2, 2019), available at https://www.cincinnati.com/story/news/2019/07/02/who-paid-all-money-buy-all-those-nuclear-bailout-ads-ohio-house-bill-6/1443145001/.

[24] In April 2019, The Energy and Policy Institute, an advocacy group for renewable energy, compiled hundreds of pages of filings from FES' ongoing bankruptcy proceedings and confirmed that from March through December 2018, FES had paid nearly $2.7 million to lobbyists and PR firms working to convince Ohio lawmakers to support bailing out the state's nuclear plants. Dave Anderson, "Bankrupt FirstEnergy Solutions spends millions on bailout campaigns in Ohio and Pennsylvania. *The Energy and Policy Institute* (April 11, 2019), available at https://www.energyandpolicy.org/firstenergy-bailout/.

HB6 into law. In all, FirstEnergy illicitly paid approximately $15 million to back Householder's media blitz and ensure that HB6 was signed into law. FES lobbyist Juan Cespedes was often in contact with Householder's lieutenants to coordinate the logistics regarding the laundered funds and how those funds would be used. For example, on June 12, 2018, the FBI Affidavit recounts the following exchange with Longstreth regarding a wire that FirstEnergy funneled to Generation Now:



107.    Two days later, Cespedes followed up, asking for a report as to how FirstEnergy's money was being spent:



108.    The text messages continued:





109. The FBI Affidavit concludes that "[t]he volume of [FirstEnergy's] payments, the timing of these payments, communication and coordination amongst co-conspirators and [FirstEnergy], the official action taken by Householder, and the actions to maintain the official action, show the corrupt arrangement was [FirstEnergy] funding Householder's speakership bid in exchange for a legislative fix."[25] Indeed, during the period from January to July 2019, when HB6 was pending, FirstEnergy's CEO had 30 phone calls with Householder—including on January 7, 2019, the day when Householder was elected Speaker. All told, from February 2017 to July 2017,

---

[25] ¶81. While FirstEnergy was referred to as Company A and not specifically named, the FBI Affidavit clearly identifies "Company A" as FirstEnergy, citing the Company's 2016 Annual Report and quoting Jones from investor conference calls held on February 22, 2017 and November 4, 2019, as well as referencing public news articles about FirstEnergy. As the U.S. Attorney David M. DeVillers said in the press conference announcing the charges, "Everyone in this room knows who Company A is."

FirstEnergy's CEO had 84 phone calls with Householder (to say nothing of Householder's 14 phone calls with FESC's CEO and 188 phone calls with FirstEnergy's Ohio Director of State Affairs). The FBI Affidavit further reveals that Longstreth's contacts during this period "exceeded even Householder's over the course of the conspiracy, to include significant phone contacts with [FirstEnergy] executives during the period from February 2017 to October 2019."

110. The bribery scheme then turned to protecting the legislation from being overturned—"to corruptly ensure that HB6 went into effect by defeating a ballot initiative."[26]

### E. The Director Defendants' Failure to Exercise Oversight Resulted in FirstEnergy's Continued Involvement in the Bribery Scheme

111. Following the passage of HB6, an article published on July 28, 2019 in the *Columbus Dispatch* discussed FirstEnergy's political contributions and the influence of dark money.[27] The article stated that the campaign to pass HB6 "included $9.5 million in TV ads, largely from a dark-money group backing FirstEnergy, which supported salvaging its bankrupt spinoff FirstEnergy Solutions." Once again, "FirstEnergy officials refused to answer questions about the contributions." The article detailed FirstEnergy's campaign contributions to Householder-backed candidates, noting that "[i]t paid to be allied with Householder. [FirstEnergy] donated $163,382 to 35 of the 98 other House members, with the 21 lawmakers who voted both for Householder for speaker and in favor of House Bill 6 pocketing the majority at $125,474 — an average of $5,975 each." The article also quoted the executive director of the Energy and Policy Institute, a clean energy watchdog group, marveling at the amount of money spent by FirstEnergy

---

[26] ¶9.

[27] Randy Ludlow, "FirstEnergy handed out $1 million in campaign cash before nuclear bailout vote," *The Columbus Dispatch* (July 28, 2019), available at https://www.dispatch.com/news/20190728/firstenergy-handed-out-1-million-in-campaign-cash-before-nuclear-bailout-vote.

and other utilities like American Electric Power ("AEP," which itself donated to Generation Now), along with dark money groups, to pass HB6. The executive director stated, "While it's unfortunately typical for investor-owned utilities to spend money to influence politicians, the amount of money that FirstEnergy Solutions, AEP and allied dark-money groups spent to buy support from legislators for their coal and nuclear bailout has been astronomical." Even as numerous articles and reports were published calling into question the "astronomical" amount of money spent by FirstEnergy, Defendants failed to take any action to uphold their fiduciary duties, instead ignoring obvious warnings that the Company was involved in corrupt political spending and lobbying.

112.    In spite of numerous red flags in the form of public scrutiny of FirstEnergy's campaign spending and close relationship to Householder, Defendants failed to exercise oversight as FirstEnergy proceeded to wire ***$23 million*** to Generation Now from the period following passage of HB6 through October 2019. The Company and Householder entered their most intense phase of coordination in the effort to defeat a campaign to overturn HB6 through a ballot initiative. As the FBI Affidavit put it, "Enterprise members and associates coordinated with [FirstEnergy] executives and lobbyists while it was receiving millions of secret dollars from [FirstEnergy] and pressuring public officials to support the bailout."[28] The goal for FirstEnergy, Householder, and Generation Now, according to a text by Juan Cespedes, was to "get the rest of the deal done."

113.    Householder and his associates were able to get the deal done by engaging in a variety of unethical and unlawful acts, while coordinating funding from FirstEnergy. Following the media spotlight on dark money used to pass HB6 discussed above, from August to October 2019, the Enterprise "pumped $23,000,000 of [FirstEnergy]-to-Generation Now money" into a

---

[28] ¶173.

"Front Company" that would conceal their "criminal acts to defeat the referendum."[29] The FBI Affidavit noted that wire records showed that "every penny of that $23 million came from Generation Now via [FirstEnergy] entities – specifically [FirstEnergy Service] and Energy Pass-Through."[30] FirstEnergy's money was used on another "media blitz," including misleading mailers about China being behind the ballot initiative, as well as ads featuring project managers from FirstEnergy's nuclear plants. As the FBI Affidavit concluded, "the media campaign against the ballot initiative is indicative of the corrupt exchange with [FirstEnergy]."[31] FirstEnergy executives saw some of the advertisements from this period.[32]

114. FirstEnergy and Generation Now also hired signature collection firms so that the firms would be prevented from working on the ballot initiative because of a conflict of interest. According to the FBI Affidavit, "*the Company A CEO," Jones, was driven by Borges "to see signature collectors who were working on behalf of [the ballot initiative].*"[33] In another instance, the FBI Affidavit recounted an episode where CEO Jones, while on the way to the airport, wanted to stop to speak to a signature collector at the Worthington library.[34] Additionally, Borges bribed an employee of the ballot initiative to obtain inside information on its signature collection efforts for the benefit of the Enterprise. Borges told the employee that "he and his firm were working for [FirstEnergy] on the ballot project."[35] Describing his efforts to defeat the ballot initiative and his

---

[29] ¶195.

[30] ¶198.

[31] ¶¶200-201.

[32] ¶225.

[33] ¶225.

[34] ¶240.

[35] ¶224.

coordination with FirstEnergy, Borges said: "The only people on my side is this f*cking company."[36]

115.    As the FBI Affidavit concluded: "the media campaign is significant… evidence of the corrupt relationship with [FirstEnergy]-the Enterprise likely would not be spending millions of dollars from Company A that was passed through a 501(c)(4) account for the benefit of [FirstEnergy]'s main legislative priority absent an agreement with [FirstEnergy]."[37]

116.    Householder and other criminal defendants also continued to personally benefit from FirstEnergy money donated to Generation Now. Following the defeat of the ballot initiative, Energy Pass-Through, which was funded by FirstEnergy Service, wired $3 million to Generation Now, which then found its way to accounts controlled by Longstreth and Householder.[38] Householder helped himself to over $100,000 "in [FirstEnergy]-to-Generation Now payments . . . to pay for costs associated with his residence in Florida."[39] Borges would comment "that it was '*insane*' how much Enterprise members were making off [FirstEnergy]."[40]

117.    FirstEnergy and Householder's plan was complete. Their unlawful tactics prevented the ballot initiative from collecting the needed signatures, and HB6 went into effect on October 21, 2019. Together, they succeeded in enacting FirstEnergy's "legislative solution" of a $1.3 billion bailout of its Nuclear Power Plants through the use of what Clark called FirstEnergy's "underlined funding. Since FirstEnergy was going to receive its bailout, Clark observed, "what do

---

[36] ¶55.

[37] ¶128.

[38] ¶244.

[39] ¶245.

[40] ¶225.

they care about putting $20 million a year for this thing, they don't give a sh*t."[41] Clark said he and the group called FirstEnergy "the Bank" because they could "fund these things for 20 years if they want … They've got too much money, too much power."[42] Clark summed up the entire operation this way: "All we cared about was getting the subsidy."[43]

118.    The scheme remained largely inactive from October 2018 until January-February 2020, when the Enterprise wired $1,010,000 of money from FirstEnergy to Team Householder candidates for the 2020 primary election.[44]

**F.    The U.S. Attorney's Complaint Implicates FirstEnergy in the Largest Public Bribery Scheme in Ohio History**

119.    On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced the filing of criminal charges against Householder, Generation Now, Cespedes, Borges, and Householder associates Jeffrey Longstreth and Neil Clark for federal racketeering conspiracy.

120.    The charging documents alleged a scheme involving the payment of approximately $60 million by FirstEnergy to the Householder-controlled entity Generation Now, for Householder's assistance in passing and upholding the bailout of the Nuclear Power Plants under HB6. The 80-page Criminal Complaint detailed a pay-to-play scheme in which FirstEnergy and Householder corrupted every facet of the legislative process in order to ensure the passage of HB6. The U.S. Attorney called it the "largest bribery, money-laundering scheme ever perpetrated" in Ohio.

---

[41] ¶186.

[42] ¶185.

[43] ¶186.

[44] ¶35.

121.    In addition to the billion-dollar bailout of the Nuclear Power Plants, the FBI Affidavit detailed other benefits received by FirstEnergy which were included by legislators in HB6 "as a result of the successful influence campaign waged" by the Company, Householder, and other criminal defendants.[45] For example, in May 2019, when HB6 was referred to the Ohio House Rules and Reference Committee, it was amended to include "a provision permitting an electric company with taxable property that is fueled by nuclear power (a company such as [FirstEnergy]) to file a petition for a reduction in taxable property value. This provision was an added benefit to [FirstEnergy]." ¶120. Then, HB6 was further amended in the Ohio State Senate to include a provision allowing electric utilities to charge customers more to make up for lost revenue in a given year. According to the FBI Affidavit, this amendment was a "further benefit" to FirstEnergy, added to HB6 "as a result of the successful influence campaign waged by Company A and the Enterprise":

> [The] amendments included a provision that gave an electric distribution utility, such as Company A Corp., the ability to decouple its energy rates. Decoupling is the dissociation of annual revenue from volume of energy sales. The decoupling mechanism was based upon the baseline revenue the company received in 2018. Therefore, if a given year's annual revenue is less than it was in 2018, the company may charge retail customers a rider, or surcharge, to compensate for the lost revenue. [¶169.]

122.    The FBI Affidavit quoted Jones' comments on a November 4, 2019 investor call confirming the benefit to FirstEnergy of the amendment, stating, "[decoupling] fixes our base revenues and essentially it takes about one-third of our company and I think makes it somewhat recession-proof. So, I get a question a lot about where I'm worried about a future recession. It's 2 million customers in Ohio that this is going to help make sure that that doesn't impact us." ¶169. In just the few months leading to the call, FirstEnergy had donated $38 million to Householder

---

[45] ¶169.

and the other criminal defendants to ensure that HB6, and all of its benefits to the Company, went into effect.[46]

123. As the FBI Affidavit lays out, almost all of the nearly $60 million paid from FirstEnergy to Householder's Generation Now entity were wired through the Company's FirstEnergy Service subsidiary, which was "under the management of [FirstEnergy's] leadership team":[47]

| Date | Amount | Method | Source |
|---|---|---|---|
| 3/16/2017 | $250,000 | Wire | Company A Service Co. |
| 5/17/2017 | $250,000 | Wire | Company A Service Co. |
| 8/10/2017 | $250,000 | Wire | Company A Service Co. |
| 12/8/2017 | $250,000 | Wire | Company A Service Co. |
| 3/15/2018 | $300,000 | Wire | Energy Pass-Through |
| 5/4/2018 | $100,000 | Wire | Energy Pass-Through |
| 8/16/2018 | $500,000 | Wire | Energy Pass-Through |

---

[46] ¶17.
[47] ¶37, ¶47.

| Date | Amount | Method | Source |
|------|--------|--------|--------|
| 10/16/2018 | $400,000 | Check | Company A Service Co. |
| 10/29/2018 | $100,000 | Check | Company A Service Co. |
| 4/30/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/7/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/15/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/22/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/29/2019 | $1,500,000 | Wire | Company A Service Co. |
| 6/5/2019 | $2,000,000 | Wire | Company A Service Co. |
| 6/13/2019 | $1,361,899 | Wire | Company A Service Co. |
| 6/20/2019 | $2,116,899 | Wire | Company A Service Co. |
| 7/5/2019 | $1,879,457 | Wire | Company A-1 Corp. |
| 8/2/2019 | $734,250 | Wire | Company A Service Co. |
| 8/7/2019 | $4,390,000 | Wire | Company A Service Co. |
| 8/22/2019 | $653,000 | Wire | Company A Service Co. |
| 8/29/2019 | $2,003,000 | Wire | Company A Service Co. |
| 9/5/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/12/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/19/2019 | $4,695,000 | Wire | Company A Service Co. |
| 9/26/2019 | $2,445,000 | Wire | Company A Service Co. |
| 10/3/2019 | $4,160,000 | Wire | Company A Service Co. |
| 10/8/2019 | $1,600,000 | Wire | Company A Service Co. |
| 10/10/2019 | $10,000,000 | Wire | Energy Pass-Through |
| 10/17/2019 | $248,000 | Wire | Company A Service Co. |
| 10/22/2019 | $3,000,000 $4,330.86 | Wire Cashier Check | Energy Pass-Through |
| 3/3/2020 | $2,000,000 | Wire | Energy Pass-Through |
| **Total:** | **$59,996,835.86** | | |

124. The FBI Affidavit makes clear that "[a]t the time [FirstEnergy] was aggressively lobbying for legislative action to save its two nuclear power plants, [FirstEnergy] was paying millions in secret payments to the Enterprise through Generation Now."[48]

125. Indeed, the FBI Affidavit identified one person who signed FirstEnergy Service checks to Generation Now "is now the President of [FirstEnergy]." Defendant Strah has been President of FirstEnergy since May 2020 and was the Company's Senior Vice President and CFO

---

[48] ¶47.

at the time he signed the checks.[49] Clark called these donations "Monopoly money" from FirstEnergy's "deep pockets."[50] The FBI Affidavit makes clear that FirstEnergy's donations were made outside of campaign finance regulations: "The millions paid into the entity are akin to bags of cash- unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny- and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves."[51]

126.    Other FirstEnergy executives were personally involved in these efforts, as well. In the crucial months when FirstEnergy and Householder were pushing for HB6's passage, Jones had at least 30 calls with Householder, and there were a total of 84 calls between them from just before when FirstEnergy started making payments to Generation Now in March 2017 through HB6's passage in July 2019. Similarly, other Company officials had numerous phone contacts with the criminal defendants at the time FirstEnergy was making large donations to Generation Now, including FirstEnergy's Director of Ohio Affairs (188 calls) and FirstEnergy Service's VP of External Affairs (14). The FBI Affidavit said that these calls, as well as text messages and other communications, taken together with bank records of FirstEnergy's donations to Generation Now, "paint a clear picture of the partnership between the Enterprise and [FirstEnergy] in working towards their agreement."[52]

127.    Additionally, criminal defendants Cespedes and Borges were registered lobbyists of FES and acted as middlemen between FirstEnergy and Householder. Cespedes' contract with FES specifically included "assisting [FES] in attaining necessary funding through government

---

[49] ¶82 at n. 22.

[50] ¶18.

[51] *Id.*

[52] ¶182.

action to allow for the financial stability/sustainability of its two nuclear power plants," FirstEnergy's "legislative solution."[53] Cespedes and Borges worked closely with FirstEnergy during this period to achieve its legislative priorities. For example, in a 2018 document created by Cespedes discussing FirstEnergy's support for Householder, Cespedes "suggested that [FirstEnergy] should continue to support the 'Larry Householder Caucus' because 'Householder has a history of favorably rewarding those who provide both early and late money into his efforts." In the document, Cespedes also cited a conversation between "Company A's CEO" (Jones), and Householder "where [CEO] suggested that we would/should independently support him as Company A-1."[54] This statement from Jones indicated FirstEnergy's continued interest in funding Householder even upon the separation of "Company A-1," or FES.

128.    Similarly, the FBI Affidavit included Borges' description of a meeting among "members of the Enterprise and Company A executives, including 'the CEO of the Company'" that took place during FirstEnergy and Householder's effort to defeat the ballot initiative opposing HB6's enactment.[55] Borges said that at the meeting "Company brass" reviewed advertisements supporting HB6.[56] According to the FBI Affidavit, the meeting "shows the Enterprise working with Company A to discuss strategy for defeating the ballot initiative, to include bribing and paying off employees and signature collectors for the ballot campaign." Borges had described the convergence of FirstEnergy, Householder, and Borges' firm as an "unholy alliance."[57]

---

[53] ¶40.

[54] ¶110.

[55] ¶240.

[56] ¶241.

[57] *Id.*

129.    The involvement of Cespedes and Borges should have raised concerns with Defendants causing them to investigate the Company's relationship with the lobbyists and their related corporate expenditures for campaigns and lobbying activities. According to the FBI Affidavit, "Cespedes coordinated the timely payment of $15 million from [FirstEnergy] to Generation Now,"[58] an incredible amount for a lone lobbyist to procure without the knowledge of a board properly exercising its oversight duties over the Company's political contributions. Borges was himself "embroiled in a pay-to-play scandal in 2004," resulting in his pleading "guilty in Cuyahoga County Common Pleas Court to a misdemeanor count of unauthorized use of a public office for giving preferential treatment to certain brokers who contributed to Republican Ohio Treasurer Joe Deters' re-election campaign."[59]

130.    In announcing the charges, U.S. Attorney David M. DeVillers and Chris Hoffman, FBI, Special Agent in Charge described the gravity of the charges. Hoffman stressed to reporters that this was a "shameful betrayal," a "sophisticated criminal conspiracy to enact legislation on behalf of Corporation A to corruptly defeat the potential ballot initiative that could've gone in front of the Ohio taxpayers." This was the "first time racketeering charges have been used on a public official in the Southern District of Ohio."

131.    Officials also explained that more arrests are indeed possible in the future because investigators can now subpoena, issue search warrants, interview and question more individuals about the case as it is no longer covert. Experts believe that prosecutors are likely cutting deals with key witnesses whose testimony could be used to get convictions against high-level personnel

---

[58] ¶33.

[59] Joe Guillen, "Matt Borges named Ohio Republican Party executive director," *Cleveland.com* (May 14, 2012), available at https://www.cleveland.com/open/2012/05/ohio_republican_party_announce.html.

both within FirstEnergy and the state government. In other words, the investigation continues, and more individuals or companies will likely be charged. DeVillers stressed: "there are going to be a lot of busy FBI agents in the Southern District of Ohio . . . <u>this is by no means over</u>."

132.    Tellingly, during the conference, U.S. Attorney DeVillers also seemingly confirmed FirstEnergy's identity as Company A stating: "Company A, provided $60 Million in return for the $1.3 billion bailout. <u>Everyone in this room knows who Company A is,</u> I will not be mentioning the name of Company A because of our regulations and rules. No one from the Company has *of yet* been charged." In response to a question by a media representative specifically referencing FirstEnergy, DeVillers responded: "<u>As I said before, individuals that work for Company A, and Company A in and of itself, we will continue to investigate this and investigate wherever it leads and where it is and whoever they work for</u>."

133.    On the same day, FirstEnergy released a statement stating that the Company had received subpoenas in connection with the investigation.

134.    In response to the announcement of the FirstEnergy/Householder pay-to-play scandal, Governor Mike DeWine stated: "I am deeply concerned about the allegations of wrongdoing issued today by the U.S. Attorney's Office," calling it "<u>a sad day for Ohio</u>."

135.    The price of FirstEnergy stock plummeted on news of the Company's fraud, falling to a low of just $22.85 per share on July 22, 2020, 45% below the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

### G.    The Fallout from the Bribery Scheme Continues

136.    The fallout from the bribery scheme has been dramatic, severe, and destructive for FirstEnergy and will only continue to worsen as more information regarding the details of the scheme are revealed.

137.     On July 23, 2020, after initially supporting the law the day before, Governor DeWine asked the state legislature to "repeal and replace House Bill 6." DeWine's change of heart came after reports detailed how his director of legislative affairs was the principal of a 501(c)(4) believed to be one of the "pass-through entities" that funneled money to Generation Now. DeWine further stated at his news conference, "While the policy, in my opinion, is good, the process by which it was created stinks. It's terrible. It's not acceptable."

138.     In addition to Governor DeWine, certain lawmakers are currently seeking to repeal the legislation. In addition to seeking a repeal, some are also now publicly donating funds received from FirstEnergy's Political Action Committee.[60]

139.     On July 24, 2020, the Company held an earnings call for its second quarter of 2020. On the call, Jones claimed to have no control over FES during the Relevant Period, but nonetheless admitted that FirstEnergy's "share" of the $60 million bribery scheme may have amounted to as much as $15 million:

> On your specific question, as I've said, ***I'm not going to get into the details of the case, but I will say this, that of the funds that are referenced in the Department of Justice affidavit, FirstEnergy's share of that is about 25%.*** And in the context of 5.5 years of meeting or exceeding every earnings commitment that we've given you every quarter, we do make prudent decisions to spend corporate funds on issues that we believe are important to our customers and shareholders. Beyond that, we intend to provide the details on what we spent, how we spend it to the Department of Justice in the coming weeks.

---

[60] *See e.g.* "Sobecki says she's donating $1,500 of FirstEnergy PAC money to Children's Services", Blade (Jul. 26, 2020), available at https://www.toledoblade.com/local/politics/2020/07/26/Sobecki-announces-she-is-donating-1-500-of-FirstEnergy-PAC-money-to-Children-s-Services/stories/20200726115; Sam Allard, "Terrence Upchurch Will Donate FirstEnergy Contributions to Charity, Vows to Support Repeal of HB6" Scene (Jul. 29, 2020), available at https://www.clevescene.com/scene-and-heard/archives/2020/07/29/terrence-upchurch-will-donate-firstenergy-contributions-to-charity-vows-to-support-repeal-of-hb6

Notably, even if the Company's "share" of the funds began from the start of the Relevant Period, the Company would not have reached 25%, or approximately $15 million, until the bribery scheme was well into 2019.[61] By that point, FirstEnergy had already funded Householder and his slate of candidates in their successful bid to control the House, and were in the midst of the efforts to pass HB6.

140.    Analysts pressed Jones about "the underlying vetting process at the time" of the payments to the 501(c)(4) and if "regulatory affairs just request them and receive approval freely?" The analyst questioned how FirstEnergy would "assess whether those funds were directed towards the 501(c) would be used for like 'social benefits versus political aspirations'" Jones did not give an answer and said that he was "going to stay away from that question."

141.    Additionally during the call, when Defendant Jones was questioned "about the reference like phone calls between you and other leadership and some of these folks," Jones responded: "No, I'm not going to talk to that…So we have to see what they're talking about…"

142.    Also on July 24, 2020, an article entitled "Majority of Ohio Legislature Received Campaign Funds From FirstEnergy" was published. The article scrutinized the Company, stating that "[w]hile it isn't unusual for large corporations to shell out millions in campaign contributions, the fact that the majority of the lawmakers received money is of note."[62] According to the Ohio Capital Journal and corroborated by Ohio Secretary of State finance data, "FirstEnergy had a relationship with the majority of both chambers" with "[r]ecords show[ing] 32 out of the 33 senators received money from FirstEnergy at some point in their career." "In the House, 77 out of

---

[61] See ¶47 at Table 1: Company A Payments to Generation Now Bank.

[62] Molly Martinez, "Majority of Ohio Legislature Received Campaign Funds From FirstEnergy" SpectrumNews1 (Jul. 24, 2020) available at https://spectrumnews1.com/oh/columbus/news/2020/07/24/majority-of-ohio-legislature-received-campaign-funds-from-firstenergy.

99 members benefited from FirstEnergy funding." The article added that "[a]ccording to campaign finance data, some of the top recipients include Bill Seitz (R-Cincinnati), whose campaign fund has raked in a collective $55,000 from the company. Anthony DeVitis (R-Green) got $53,000 for his campaign…Senator Sandra Williams (D-Cleveland) spoke out against the bill, saying it took Ohio backwards, but then ended up voting for it. Her campaign received $31,000 from FirstEnergy."

143.    On July 30, 2020, Householder, and the other arrested conspirators, were officially indicted by a Grand Jury in the Southern District of Ohio. *See United States v. Householder, et al.,* 1:20-cr-00077 (S.D. Ohio).[63] The Grand Jury decision was filed just before the Ohio House of Representatives voted 90-to-0 to strip Householder of his Speaker position, marking the first time in Ohio history that the House has voted to unseat its leader.

144.    Also on that day, Rep. Bob Cupp was elected to replace indicted Larry Householder as the next speaker of the Ohio House of Representatives. However, Cupp may also have unethical FirstEnergy ties. According to an August 10, 2020 article entitled "New Ohio Speaker Has His Own Ethics Issues Involving FirstEnergy," "FirstEnergy ("Company A" in the Householder charging document) has been Cupp's sixth-highest donor, with its PAC contributing a total of $21,650 over seven elections." Cupp also was "the subject of a judicial ethics complaint involving campaign contributions from FirstEnergy, one of his top donors"[64]:

> Cupp has faced his share of ethics allegations stemming from his energy industry donations. During his unsuccessful 2012 re-election race for Supreme Court, Cupp's Democratic challenger, retired judge William O'Neill, filed a formal complaint alleging that Cupp and another justice, Republican-appointed Terrence

---

[63] Recently, on September 3, 2020, Householder pled not guilty to the charges against him in the criminal case.

[64] David Moore, "New Ohio Speaker Has His Own Ethics Issues Involving FirstEnergy," *Sludge* (Aug. 10, 2020), available at https://readsludge.com/2020/08/10/new-ohio-speaker-has-his-own-ethics-issues-involving-firstenergy/

O'Donnell, violated Canon 1 of the Ohio Code of Judicial Conduct by taking campaign contributions from a party of interest in a case.

In the 2012 case in question, an attorney participated who was representing power provider Ohio Edison, which was owned by <u>FirstEnergy, the Akron-based energy company at the center of the Householder bribery scandal. Two weeks after oral arguments, FirstEnergy's PAC donated $6,300 to each of the re-election campaigns of Cupp and O'Donnell. Four weeks later, Cupp and O'Donnell joined a majority opinion favoring Ohio Edison in the case, O'Neill's formal grievance detailed</u>

145.     In addition to Cupp, Sam Randazzo's FirstEnergy ties are also being questioned as a new campaign aims to oust Ohio's top utilities regulator.[65] Specifically, The Ohio Consumers Power Alliance is tying him to FirstEnergy through his previous work as a lobbyist and attorney.

146.     An article published on July 30, 2020 by *Cleveland.com* entitled "Ohio lawmakers seek to repeal another bill benefiting FirstEnergy -- this time, over 'excessive' profits" reported that two state Representatives were seeking to repeal a 2019 budget bill provision added "by an unknown House member" which allowed FirstEnergy to combine the profits of three subsidiaries to avoid a finding that one had "significantly excessive" profits."[66] Ohio state law provides that if a utility is found to have made "significantly excessive" profits, typically about 17%, then anything in excess must be returned to customers. FirstEnergy sought this change to allow one of its higher profit subsidiaries "to make a windfall" by averaging it with two lower profit subsidiaries, bringing their combined profits below the "significantly excessive" threshold. In a statement calling for the

---

[65] Laura Hancock, "A new campaign aims to oust Ohio's top utilities regulator. Who is Sam Randazzo and how is he tied to FirstEnergy?" Cleveland.com (Aug. 13, 2020) available at https://www.cleveland.com/open/2020/08/a-new-campaign-aims-to-oust-ohios-top-utilities-regulator-who-is-sam-randazzo-and-how-is-he-tied-to-firstenergy.html.

[66] Jeremy Pelzer, "Ohio lawmakers seek to repeal another bill benefiting FirstEnergy -- this time, over 'excessive' profits," Cleveland.com (July 30, 2020), available at https://www.cleveland.com/open/2020/07/ohio-lawmakers-seek-to-repeal-another-bill-benefiting-firstenergy-this-time-over-excessive-profits.html.

repeal of the "Corrupt Price Gouging Budget Amendment Benefiting FirstEnergy," one of the

bill's sponsors said that the "pay-to-play mentality has to come to an end."[67]

147.    On August 10, 2020, FirstEnergy filed a Notification of Late Filing with the SEC

stating that they would not be able to file their quarterly report on time due to the "<u>investigation,

subpoenas and subsequent pending and threatened litigation</u>":

> On July 21, 2020, a complaint and supporting affidavit containing federal criminal
> allegations were unsealed against the now former Ohio House Speaker Larry
> Householder and other individuals and entities allegedly affiliated with
> Mr. Householder. Also, on July 21, 2020, and in connection with the investigation,
> the Company received subpoenas for records from the U.S. Attorney's Office for
> the Southern District of Ohio. The Company was not aware of the criminal
> allegations, affidavit or subpoenas before July 21, 2020…
>
> In addition to the subpoenas referenced above, in late July 2020, certain of the
> Company's stockholders and customers filed several lawsuits against the Company
> and certain current and former directors, officers and other employees, each relating
> to the allegations against the now former Ohio House Speaker Larry Householder
> and other individuals and entities allegedly affiliated with Mr. Householder. In
> connection with the investigation, subpoenas and subsequent pending and
> threatened litigation, the Company requires additional time to complete its
> quarterly review and closing procedures and to provide appropriate disclosure in
> the Form 10-Q. While no assurance can be given, the Company intends to file the
> Form 10-Q on or before the fifth calendar day following the prescribed due date, in
> accordance with Rule 12b-25.

148.    Indeed, as noted above, in addition to the criminal charges, several other lawsuits

have been filed in connection with the Ohio bribery scheme, including two securities class actions:

*Owens v. FirstEnergy Corp., et al.,* 2:20-cv-03785 (S.D. Ohio) and *Frand v. FirstEnergy Corp. et

al.*, No. 2:20-cv-04287 (S.D. Ohio); four RICO class actions: *Smith v. FirstEnergy Corp., et al.,*

2:20-cv-03755 (S.D. Ohio), *Buldas v. FirstEnergy Corp., et al.,* 1:20-cv-00593 (S.D. Ohio),

---

[67] Ohio State Rep. Michael Skindell, "Reps. Skindell, Denson Introduce HB 740 To Repeal
Corrupt Price Gouging Budget Amendment Benefiting First Energy," Press Release (July 30,
2020), available at http://www.ohiohouse.gov/michael-j-skindell/press/reps-skindell-denson-
introduce-hb-740-to-repeal-corrupt-price-gouging-budget-amendment-benefiting-first-energy.

*Hudock v. FirstEnergy Corp.*, Case No. 2:20-cv-03954 (S.D. Ohio), and *Szep v. FirstEnergy Corp., et al.*, Summit C.P. No. CV-2020-07-2133; and a class action alleging, *inter alia*, gross negligence, breach of contract, and deceptive consumer acts or practices: *Emmons v. FirstEnergy Corp.*, Cuyahoga C.P. No. CV-20-935557.

149. On August 12, 2020, Cleveland City Council voted unanimously to launch investigations into whether the FirstEnergy corruption scandal sought to harm city-owned Cleveland Public Power. City Council President Kevin Kelley, the primary sponsor of the resolution, noted that CPP is a competitor to FirstEnergy in Cleveland and that he intends for the investigation to include a look at lobbying by FirstEnergy.[68]

150. The full costs to FirstEnergy from its illicit conduct have yet to fully materialize, but initial reports from analysts suggest that regulatory fines will be massive. Reports have drawn "parallels to Commonwealth Edison's agreement to pay $200 million to resolve a bribery complaint involving Illinois legislators."[69] *Wolfe Research* and *CreditSights* have estimated fines and penalties to the Company in the $500 million range. *UBS* stated that they "consider an SEC investigation a possibility (similar to what [Exelon Corporation] faces) and we believe there is the potential for credit rating agencies to downgrade FE to non-investment grade (BBB-/Baa3)." ScotiaBank downgraded the Company's stock and stated "it seems quite likely to us that things will get worse for FE before they get better."

---

[68] Robert Higgs, "Cleveland City Council OK's investigating efforts against CPP, but members want to scrutinize CPP, too," *Cleveland.com* (Aug. 13, 2020), available at https://www.cleveland.com/cityhall/2020/08/cleveland-city-council-oks-investigating-efforts-against-cpp-but-members-want-to-scrutinize-cpp-too.html.

[69] Jim Provance and Tom Henry, "Five arrested, including Ohio House speaker, over corruption allegations from nuke plant bailout" *The Blade* (July 21, 2020), available at https://www.toledoblade.com/local/politics/2020/07/21/FBI-launches-raids-related-to-nuclear-bailout-law-source-says/stories/20200721079.

151. The Company remains subject to a litany of criminal and civil lawsuits and investigations by both governmental and private entities. The costs to FirstEnergy in terms of losses from the illicit bribery scheme have yet to fully materialize with ramifications from the scandal continuing to grow daily.

**H.** **Defendants Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah Unlawfully Profited at FirstEnergy's Expense by Selling Shares While in Possession of Non-Public Information**

152. Defendants Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah collectively sold or otherwise disposed of millions of dollars' worth of FirstEnergy stock during that time, all while in the possession of material, non-public information. Specifically, Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah knew, participated, or recklessly disregarded the unlawful practices related to the Ohio bribery scheme detailed in this Complaint when they sold their stock. These Defendants engaged in the transactions despite the fact that they were in possession of this materially adverse information and that the Company's own Insider Trading Policy specifically prohibited persons who were aware of material non-public information about the Company from trading in securities of the Company.

153. As detailed in the chart below, between 2017 and 2020, before the full extent and the impact of the Ohio bribery scheme on FirstEnergy became publicly known, and while directly participating in the bribery scheme, Jones sold or otherwise disposed of over 788,000 shares of FirstEnergy common stock for a total of over $31 million:

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/17 | Sale to Issuer[70] | 24,485 | $31.74 | $777,154 |

---

[70] Represents a sale of shares back to the Company at that day's closing price.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/18 | Forfeiture[71] | 106,716 | $32.48 | $3,466,136 |
| 03/01/18 | Sale to Issuer | 116,045 | $32.48 | $3,769,490 |
| 03/01/19 | Forfeiture | 134,511 | $40.73 | $5,478,633 |
| 03/01/19 | Sale to Issuer | 148,302 | $40.73 | $6,040,340 |
| 03/01/20 | Forfeiture | 123,757 | $44.40 | $5,494,811 |
| 03/01/20 | Sale to Issuer | 134,576 | $44.40 | $5,975,174 |
| **Total** | **-** | **788,392** | **-** | **$31,001,738** |

154.    As detailed above, the truth about FirstEnergy's involvement in the Ohio bribery scheme came to light in July 2020.  Jones's sales of FirstEnergy shares between 2017 and 2020 were motivated by his non-public knowledge that if revelations of FirstEnergy's conduct with respect to the Ohio bribery scheme were made public, FirstEnergy would be revealed to be so culpable in the fraud that its share price would drop.

155.    As detailed in the charts below, between 2017 and 2020, before the full extent and the impact of the Ohio bribery scheme scandal on FirstEnergy became known, Strah sold or otherwise disposed of over 99,000 shares of FirstEnergy common stock for a total gain of almost $4 million.  As a top executive with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, Strah would have knowledge of the Ohio bribery scheme.  Thus, from 2017 through 2020, he possessed material non-public information about the true extent of the risk that FirstEnergy faced from its role in the Ohio bribery scheme scandal.  Nevertheless, motivated by this information, he traded on this information at inflated prices, netting nearly $4 million.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/17 | Forfeiture | 2,454 | $31.74 | $77,890 |
| 03/01/18 | Sale to Issuer | 12,347 | $32.48 | $401,068 |

---

[71] Represents tax forfeiture to cover tax withholdings.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/18 | Forfeiture | 12,716 | $32.48 | $413,054 |
| 03/01/19 | Sale to Issuer | 23,823 | $40.73 | $970,311 |
| 03/01/19 | Forfeiture | 21,608 | $40.73 | $880,094 |
| 03/01/20 | Sale to Issuer | 24,020 | $44.40 | $1,066,488 |
| 03/01/20 | Forfeiture | 2,330 | $44.40 | $103,452 |
| **Total** | **-** | **99,298** | **-** | **$3,912,357** |

156. As detailed in the charts below, between 2017 and 2019, before the full extent and the impact of the Ohio bribery scheme scandal on FirstEnergy became known, Pearson sold or otherwise disposed of over 226,000 shares of FirstEnergy common stock for a total gain of over $8 million. As a top executive with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, Pearson would have knowledge of the Ohio bribery scheme. Thus, from 2017 through 2019, he possessed material non-public information about the true extent of the risk that FirstEnergy faced from its role in the Ohio bribery scheme scandal. Nevertheless, motivated by this information, he traded on this information at inflated prices, netting over $8 million.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/17 | Forfeiture | 25,092 | $31.74 | $796,420 |
| 03/01/18 | Sale to Issuer | 39,821 | $32.48 | $1,293,506 |
| 03/01/18 | Forfeiture | 33,629 | $32.48 | $1,092,371 |
| 01/09/19 | Open Market Sale | 40,000 | $37.87 | $1,514,840 |
| 03/01/19 | Sale to Issuer | 46,246 | $40.73 | $1,883,600 |
| 03/01/19 | Forfeiture | 41,751 | $40.73 | $1,700,518 |
| **Total** | **-** | **226,539** | **-** | **$8,281,255** |

157. As detailed in the charts below, between 2017 and 2018, before the full extent and the impact of the Ohio bribery scheme scandal on FirstEnergy became known, Taylor sold or otherwise disposed of over 11,000 shares of FirstEnergy common stock for a total gain of over

$383,000.  As a top executive with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, Taylor would have knowledge of the Ohio bribery scheme.  Thus, from 2017 through 2018, he possessed material non-public information about the true extent of the risk that FirstEnergy faced from its role in the Ohio bribery scheme scandal.  Nevertheless, motivated by this information, he traded on this information at inflated prices, netting over $383,000.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/17 | Forfeiture | 660 | $31.74 | $20,948 |
| 03/01/18 | Forfeiture | 3,427 | $32.48 | $111,319 |
| 03/01/18 | Sale to Issuer | 7,725 | $32.48 | $250,931 |
| **Total** | **-** | **11,812** | **-** | **$383,198** |

158.    As detailed in the chart below, between 2017 and 2020, before the full extent and the impact of the Ohio bribery scheme scandal on FirstEnergy became known, Reffner sold or otherwise disposed of over 51,000 shares of FirstEnergy common stock for a total gain of over $1,860,000.  As a top executive with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, Reffner would have knowledge of the Ohio bribery scheme.   Thus, from 2017 through 2020, he possessed material non-public information about the true extent of the risk that FirstEnergy faced from its role in the Ohio bribery scheme scandal.  Nevertheless, motivated by this information, Reffner traded on this information at inflated prices, netting over $1,860,000.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/17 | Forfeiture | 5,175 | $31.74 | $164,255 |
| 03/01/18 | Sale to Issuer | 7,978 | $32.48 | $259,149 |
| 03/01/18 | Forfeiture | 4,917 | $32.48 | $159,719 |
| 03/01/19 | Sale to Issuer | 9,132 | $40.73 | $371,946 |

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/19 | Forfeiture | 7,362 | $40.73 | $299,854 |
| 03/01/20 | Forfeiture | 8,052 | $44.40 | $357,509 |
| 03/01/20 | Sale to Issuer | 9,207 | $44.40 | $408,791 |
| **Total** | - | **51,823** | - | **$1,861,664** |

159. As detailed in the chart below, between 2017 and 2019, before the full extent and the impact of the Ohio bribery scheme scandal on FirstEnergy became known, Dowling sold or otherwise disposed of over 38,000 shares of FirstEnergy common stock for a total gain of over $1,393,000. As a top executive with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, Dowling would have knowledge of the Ohio bribery scheme. Thus, from 2017 through 2019, Dowling possessed material non-public information about the true extent of the risk that FirstEnergy faced from its role in the Ohio bribery scheme scandal. Nevertheless, motivated by this information, he traded on this information at inflated prices, netting over $1,393,000.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/17 | Forfeiture | 5,007 | $31.74 | $158,922 |
| 03/01/18 | Sale to Issuer | 8,729 | $32.48 | $283,544 |
| 03/01/18 | Forfeiture | 5,375 | $32.48 | $174,596 |
| 03/01/19 | Forfeiture | 8,629 | $40.73 | $351,459 |
| 03/01/19 | Sale to Issuer | 10,446 | $40.73 | $425,466 |
| **Total** | - | **38,186** | - | **$1,393,987** |

160. As detailed in the chart below, between 2018 and 2019, before the full extent and the impact of the Ohio bribery scheme scandal on FirstEnergy became known, Yeboah-Amankwah sold or otherwise disposed of over 12,000 shares of FirstEnergy common stock for a total gain of over $453,000. As a top executive with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, Yeboah-Amankwah would have

knowledge of the Ohio bribery scheme. Thus, from 2018 through 2019, she possessed material non-public information about the true extent of the risk that FirstEnergy faced from its role in the Ohio bribery scheme scandal. Nevertheless, motivated by this information, she traded on this information at inflated prices, netting over $453,000.

| Transaction Date | Transaction Type | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| 03/01/18 | Sale to Issuer | 3,456 | $32.48 | $112,261 |
| 03/01/18 | Forfeiture | 2,194 | $32.48 | $71,268 |
| 03/01/19 | Forfeiture | 2,572 | $40.73 | $104,758 |
| 03/01/19 | Sale to Issuer | 4,052 | $40.73 | $165,038 |
| **Total** | - | **12,274** | - | **$453,325** |

## V.   THE DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT

### A.   Defendants Issue False Proxies in Violation of Section 14(a) of the Exchange Act

161.   The Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing FirstEnergy to issue proxy statements that failed to disclose the Ohio bribery scheme or the seriously deficient internal controls and compliance practices that allowed the bribery scheme to begin and helped perpetuate it. Director Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

#### 1.   The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2018 Proxy

162.   On March 30, 2018, the Director Defendants caused FirstEnergy to issue its 2018 Annual Proxy Statement (the "2018 Proxy") in connection with the 2018 annual stockholders meeting to be held on May 15, 2018. In the 2018 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicited votes, the Director Defendants issued materially false or misleading statements.

71

163.    The 2018 Proxy described the Board's key role in risk oversight:

Board's Role in Risk Oversight

Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, the full Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy.

* * *

In addition to the Audit Committee's role in risk oversight, our other Board committees also play a role in risk oversight within each of their areas of responsibility. Specifically, the Compensation Committee reviews, discusses, and assesses risks related to compensation programs, including incentive compensation and equity-based plans, as well as the relationship between our risk management policies and practices and compensation. See also, "Risk Assessment of Compensation Programs" found in the "Compensation Discussion and Analysis" (the "CD&A") section in this proxy statement. The Corporate Governance Committee considers risks related to corporate governance, including Board and committee membership, Board effectiveness, and related person transactions. . . . We believe that your Board's role in risk oversight is consistent with and complemented by your Board's leadership structure.

164.    Specifically, with respect to the Audit Committee, the 2018 Proxy stated:

The purpose of the Audit Committee is to assist your Board with oversight of: the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; … and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements.

165.    Specifically, with respect to the Corporate Governance Committee, the 2018 Proxy stated:

The purpose of the Corporate Governance Committee is to develop, recommend to your Board, and periodically review the corporate governance principles applicable to your Company. . . .

The Corporate Governance Committee's charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations. The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations . . . .

166.    The 2018 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2018 Proxy also omitted any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2018 Proxy was filed the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to and questioned Householder's intimate relationship with FirstEnergy.

167. The 2018 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2018 Proxy Statement, FirstEnergy stockholders voted to re-elect Defendants Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Thornton to the Board.

168. The 2018 Proxy also urged stockholders to approve an advisory vote to approve executive compensation. In recommending that shareholders vote in favor of the proposal, the 2018 Proxy stated:

> The primary objectives of your Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs [named executive officers], who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a ***pay-for-performance*** philosophy.

> \* \* \*

> Your Board strongly believes that our compensation philosophy, in conjunction with continued shareholder outreach, is in the best interests of shareholders.

169. With respect to the Compensation Committee, the 2018 Proxy stated:

> The purpose of the Compensation Committee is to discharge the responsibilities of your Board as specified in the Compensation Committee Charter relating to the compensation of certain senior-level officers of your Company, including your CEO, your Company's other non-CEO executive officers, the Chairman of the Board, if the Chairman of the Board is not an employee, and other individuals named in your Company's annual proxy statement. The Compensation Committee's responsibilities also include: (i) review, discuss, and endorse a compensation philosophy and objectives that support competitive ***pay-for-performance*** and are consistent with the corporate strategy; (ii) assist your Board in establishing the appropriate incentive compensation and equity-based plans for your Company's executive officers and other senior-level officers; administer such plans in order to attract, retain, and motivate skilled and talented executives and to align such plans with Company and business unit performance, business strategies, and growth in shareholder value….

74

170. Highlights from the 2018 Annual Proxy related to the firm's compensation practices included:

Compensation Philosophy

The primary objectives of our executive compensation programs are to:

- Attract, retain, focus and reward talented executives who drive our success in the highly complex utility industry by offering competitive total compensation for our executives overall;

- Promote the long-term financial health of the business, and the creation of value for the sustained benefit of shareholders, by emphasizing long-term incentives in the pay mix;

- Seek to calibrate pay to performance to ensure that the interests of our executives and shareholders are aligned, such that 50th percentile compensation is realized for strong corporate performance, above 50th percentile compensation is realized for exceptional performance, and below 50th percentile compensation is realized for below expected performance;

- Tie executive awards to overall business unit performance to hold executives accountable for their areas of responsibility as well as overall corporate results;

- Recognize individual contributions, including individual performance, experience, and future potential in determining individual target and actual pay levels to ensure that the Company retains our most critical talent; and

- Conduct ourselves in a way that comports with standards of good governance, consistent with creating long-term value for shareholders.

171. With respect to the risk assessment of the Company's compliance programs, the 2018 Proxy stated:

The Compensation Committee and management designed our compensation programs to align our executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking. In this regard, our compensation structure contains various features intended to mitigate excessive risk taking. These features include, among others:

- The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking . . . .

75

Additionally, our Chief Risk Officer participated in the discussion with senior management regarding the establishment of goals and their weightings and measurements for our short- and long-term incentive compensation programs . . . . The Chief Risk Officer provided his view to the Compensation Committee that:

* * *

- Proposed goals would not create inappropriate incentives or inadvertently encourage willingness to embrace risk exposures other than those we encounter in the normal course of our business;

- By avoiding individually based goals or goals applicable only to a small group of employees, the risk of encouraging inappropriate behavior is greatly mitigated . . . .

172.    The statements in the 2018 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

173.    Under this false impression, numerous FirstEnergy stockholders voted in support of compensation to Defendants Jones, Pearson, and Strah, totaling over $15.2 million, $5.9 million, and $3.9 million, respectively, in 2017 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' roles in, and their failure to address, the Ohio bribery scheme.

### 2.    The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2019 Proxy

174.    On April 1, 2019, the Director Defendants caused FirstEnergy to issue its 2019 Annual Proxy Statement (the "2019 Proxy") in connection with the 2019 annual stockholders meeting to be held on May 21, 2019. In the 2019 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

175.    The 2019 Proxy described the Board's key role in risk oversight:

Board Oversight

*Risk Management*

Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A management Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, your Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy.

* * *

In addition to the Audit Committee's role in risk oversight, our other Board committees also play a role in risk oversight within each of their areas of responsibility. Specifically, the Compensation Committee reviews, discusses, and assesses risks related to compensation programs, including incentive compensation and equity-based plans, as well as the relationship between our risk management policies and practices and compensation. See also, "Risk Assessment of Compensation Programs" found in the "Compensation Discussion and Analysis" (the "CD&A") section in this proxy statement. The Corporate Governance, Sustainability and Corporate Responsibility Committee considers risks related to corporate governance, including Board and committee membership, Board

77

effectiveness, and related person transactions. . . . We believe that your Board's role in risk oversight is consistent with and complemented by your Board's leadership structure.

176.    Specifically, with respect to the Audit Committee, the 2019 Proxy stated:

The Audit Committee is primarily responsible for assisting your Board with oversight of the integrity of the Company's:

- financial statements;

- compliance with legal, risk management and regulatory requirements…

- systems of internal control with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements; and

- oversee major financial risk exposures . . . .

177.    In addition, with respect to the Corporate Governance, Sustainability and Corporate Responsibility Committee, the 2019 Proxy stated:

The Corporate Governance, Sustainability and Corporate Responsibility Committee is primarily responsible for:

* * *

- developing and periodically reviewing our corporate governance policies.

The Committee is also directly responsible for oversight of our (i) political activities and practices and (ii) our corporate citizenship practices, including sustainability, environmental and corporate social responsibility initiatives.

178.    The 2019 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2019 Proxy also omitted any disclosures reflecting or acknowledging that Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2019 Proxy was filed

78

the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to and questioned Householder's intimate relationship with FirstEnergy.

179. The 2019 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

180. The 2019 Proxy also urged stockholders to approve an advisory vote to approve executive compensation. In recommending that shareholders vote in favor of the proposal, the 2019 Proxy stated:

> The primary objectives of your Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs, who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a ***pay-for-performance*** philosophy.

> \* \* \*

> Your Board strongly believes that our compensation philosophy, in conjunction with continued shareholder outreach, is in the best interests of shareholders.

181. With respect to the Compensation Committee, the 2019 Proxy stated:

The Compensation Committee is primarily responsible for:

- discharging the responsibilities of your Board relating to compensation of certain executive officers of the Company, including our CEO;

- endorsing a compensation philosophy and objectives that support competitive ***pay for performance*** and are consistent with our corporate strategy;

- establishing the appropriate incentive compensation and equity-based plans for our senior-level officers . . . .

182. Highlights from the 2019 Proxy related to the firm's compensation practices included:

Compensation Philosophy

The primary objectives of our executive compensation programs are to:

- Attract, retain, focus and reward talented executives who drive our success in the highly complex utility industry by offering competitive total compensation for our executives overall;

- Promote the long-term financial health of the business, and the creation of value for the sustained benefit of shareholders, by emphasizing long-term incentives in the pay mix;

- Seek to calibrate pay to performance to ensure that the interests of our executives and shareholders are aligned, such that 50th percentile compensation is realized for strong corporate performance, above 50th percentile compensation is realized for exceptional performance, and below 50th percentile compensation is realized for below expected performance;

- Tie executive awards to corporate results as well as to overall business unit performance to hold executives accountable for their areas of responsibility;

- Recognize individual contributions, including individual performance, experience, and future potential in determining actual pay levels to ensure that the Company retains our most critical talent; and

- Conduct ourselves in a way that comports with standards of good governance, consistent with creating long-term value for shareholders

183. With respect to the risk assessment of the Company's compliance programs, the 2019 Proxy stated:

The Compensation Committee and management designed our compensation programs to align our executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking. In this regard, our compensation structure contains various features intended to mitigate excessive risk taking. These features include, among others:

- The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking . . . .

Additionally, our Chief Risk Officer participated in the discussion with senior management regarding the establishment of goals and their weightings and measurements for our short- and long-term incentive compensation programs . . . . The Chief Risk Officer provided his view to the Compensation Committee that:

* * *

- Proposed goals would not create inappropriate incentives or inadvertently encourage willingness to embrace risk exposures other than those we encounter in the normal course of our business;

- By avoiding individually based goals or goals applicable only to a small group of employees, the risk of encouraging inappropriate behavior is greatly mitigated . . . .

184. The statements in the 2019 Proxy related to compensation falsely and misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

185. Under this false impression, numerous FirstEnergy stockholders voted in support of compensation to Defendants Jones, Strah, and Pearson and other executives totaling over $11.1 million, $3.4 million, and $3.8 million, respectively, in 2018 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

### 3. The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2020 Proxy

186. On April 1, 2020, the Director Defendants caused FirstEnergy to issue its 2020 Proxy Statement (the "2020 Proxy") in connection with the 2020 annual stockholders meeting to be held on May 19, 2020. In the 2020 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive

compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

187.    The 2020 Proxy described the Board's key role in risk oversight:

Board Oversight

*Risk Management*

The Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of the Company. The Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A management Risk Policy Committee, consisting of the Vice President, Risk & Internal Audit (who serves as our Chief Risk Officer) and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, your Board considers risks applicable to the Company at each meeting in connection with its consideration of significant business and financial developments of the Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review the Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in the Company's strategy.

\* \* \*

In addition to the Audit Committee's role in risk oversight, our other Board committees also play a role in risk oversight within each of their areas of responsibility. Specifically, the Compensation Committee reviews, discusses, and assesses risks related to compensation programs, including incentive compensation and equity-based plans, as well as the relationship between our risk management policies and practices and compensation. See also, "Risk Assessment of Compensation Programs" found in the CD&A section in this proxy statement. The

Corporate Governance and Corporate Responsibility Committee considers risks related to corporate governance, including Board and committee membership, Board effectiveness, related person transactions, and the Company's corporate citizenship practices. . . . We believe that your Board's role in risk oversight is consistent with and complemented by your Board's leadership structure.

188. Specifically, with respect to the Audit Committee, the 2020 Proxy stated:

The Audit Committee is primarily responsible for assisting your Board with oversight of:

- the integrity of the Company's financial statements;

- compliance with legal, risk management and regulatory requirements . . . .

- systems of internal control with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements; and

- major financial risk exposures . . . .

189. Specifically, with respect to the Corporate Governance and Corporate Responsibility Committee, the 2020 Proxy stated:

The Corporate Governance and Corporate Responsibility Committee is primarily responsible for:

\* \* \*

- developing and periodically reviewing our corporate governance policies.

The Committee is also directly responsible for oversight of our (i) political activities and practices and (ii) our corporate citizenship practices, including sustainability, environmental and corporate social responsibility initiatives.

190. The 2020 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2020 Proxy also omitted any disclosures reflecting or acknowledging that Defendants failed to address numerous red flags

83

after they should have been aware of the misconduct. Indeed, by the time the 2020 Proxy was filed the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout.  Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to and questioned Householder's intimate relationship with FirstEnergy.

191.    The 2020 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

192.    The 2020 Proxy also urged stockholders to approve an advisory vote to approve executive compensation. In recommending that shareholders vote in favor of the proposal, the 2020 Proxy stated:

> The primary objectives of the Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs, who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a ***pay-for-performance*** philosophy.
>
> * * *
>
> Your Board strongly believes that our compensation philosophy, in conjunction with continued shareholder outreach, is in the best interests of shareholders.

193.    With respect to the Compensation Committee, the 2020 Proxy stated:

The Compensation Committee is primarily responsible for:

- discharging the responsibilities of your Board relating to compensation of certain executive officers of the Company, including our CEO;

- endorsing a compensation philosophy and objectives that support

competitive pay for performance and are consistent with our corporate strategy;

- establishing the appropriate incentive compensation and equity-based plans for our senior-level officers . . . .

194.    Highlights from the 2020 Proxy related to the firm's compensation practices included:

Compensation Philosophy

The primary objectives of our executive compensation programs are to:

- Attract, retain, focus and reward talented executives who drive our success in the highly complex utility industry by offering competitive total compensation for our executives overall;

- Promote the long-term financial health of the business, and the creation of value for the sustained benefit of shareholders, by emphasizing long-term incentives in the pay mix;

- Seek to calibrate pay for performance to ensure the interests of our executives and shareholders are aligned, such that 50th percentile compensation is realized for strong corporate performance, above 50th percentile compensation is realized for exceptional performance, and below 50th percentile compensation is realized for below expected performance;

- Tie executive awards to corporate results as well as to overall business unit performance to hold executives accountable for their areas of responsibility;

- Recognize individual contributions, including individual performance, experience, and future potential in determining actual pay levels to ensure that the Company retains our most critical talent; and

- Conduct ourselves in a way that comports with standards of good governance, consistent with creating long-term value for shareholders.

195.    With respect to the risk assessment of the Company's compliance programs, the 2020 Proxy stated:

The Compensation Committee and management designed our compensation programs to align our executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking. In this regard, our compensation structure contains various features intended to mitigate excessive risk taking. These features include, among others:

85

- The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking . . . .

Additionally, our Chief Risk Officer participated in the discussion with senior management regarding the establishment of goals and their weightings and measurements for our short- and long-term incentive compensation programs . . . . The Chief Risk Officer provided his view to the Compensation Committee that:

* * *

- Proposed goals would not create inappropriate incentives or inadvertently encourage willingness to embrace risk exposures other than those we encounter in the normal course of our business;

- By avoiding individually based goals or goals applicable only to a small group of employees, the risk of encouraging inappropriate behavior is greatly mitigated . . . .

196. The statements in the 2020 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

197. Under this false impression, numerous FirstEnergy stockholders voted in support of compensation to Defendant Jones, Strah, Reffner, and Pearson and other executives, totaling over $14.6 million, $6.0 million, $2.4 million, and $7.2 million, respectively, in 2019 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

## VI.   DAMAGES TO FIRSTENERGY

198. As a direct and proximate result of Defendants' misconduct, FirstEnergy has been severely damaged and injured. Moreover, Defendants' faithless acts and/or omissions have irreparably damaged FirstEnergy's reputation, credibility, corporate image and goodwill. For at least the foreseeable future, FirstEnergy will suffer from what is known as the "liar's discount," a

term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that FirstEnergy's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as a direct and proximate result of Defendants' misconduct, FirstEnergy has been named a defendant in class action lawsuits for violations of the federal securities laws and become the subject of federal investigations. Damages to FirstEnergy will include costs incurred in defending against, and the potential settlement of, civil and criminal legal and regulatory proceedings brought against the Company related to the Ohio bribery scheme, as well as regulatory penalties, fines and costs.

199. The full costs to FirstEnergy from its illicit conduct have yet to fully materialize, but initial reports from analysts suggest that regulatory fines will be massive. In a July 24, 2020 report, EverCore assumed the Company would pay $200 million in fines. Wolfe Research and CreditSights have estimated fines and penalties to the Company in the $500 million range.

## VII. DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS

### A. The Duties of All Defendants

200. By reason of their positions as directors of FirstEnergy and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed FirstEnergy and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that FirstEnergy operated in compliance with all applicable federal and state laws, rules and regulations. Defendants were and are required to act in furtherance of the best interests of FirstEnergy and its shareholders so as to benefit all shareholders equally and not in furtherance of Defendants' personal interest or benefit. Each director owes to FirstEnergy and its shareholders the fiduciary duty to exercise good faith

and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

201.     Because of their positions of control and authority as directors of FirstEnergy, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint. Due to their positions with FirstEnergy, Defendants had knowledge of material non-public information regarding the Company.

202.     To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of the Company. By virtue of such duties, the officers and directors of FirstEnergy were required to, among other things:

    a.     Manage, conduct, supervise, and direct the employees, businesses and affairs of FirstEnergy in accordance with laws, rules and regulations, and the charter and by-laws of FirstEnergy;

    b.   Ensure that FirstEnergy did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

    c.   Remain informed as to how FirstEnergy was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

    d.   Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by FirstEnergy, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company;

e.   Preserve and enhance FirstEnergy's reputation as befits a public corporation;

f.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

g.   Refrain from unduly benefiting themselves and other FirstEnergy insiders at the expense of the Company.

**B.   The Company's Code of Business Conduct, the Board of Directors Code of Ethics and Business Conduct, Corporate Governance Policies, Insider Trading Policy, Corporate Political Activity Policy and Board Committee Charters**

203.   FirstEnergy's Code of Business Conduct (the "Code") applies to each of the Defendants. As Defendant Jones himself stated:

> Maintaining high ethical standards builds trust with our customers, shareholders, fellow personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. Our Code of Business Conduct communicates the fundamentals of ethical behavior in the workplace and provides important guidelines to ensure we maintain our high standards. It applies equally to all FirstEnergy personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.

204.   Further, the Code states that "the Board of Directors, in concert with the CEO and Executive Council, will lead the Company," with the Code also setting forth the following, in relevant part:

> This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities. It also helps to guide us when formulating and pursuing Company goals and objectives.
>
> * * *
>
> FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code.
>
> * * *

89

Known or suspected violations of laws, rules, regulations or this Code are serious matters and must be dealt with accordingly….This reporting requirement includes any actual, potential or suspected violations of the securities laws (such as any accounting, investor or financial and financial reporting related matters).

\* \* \*

This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability. ***It is endorsed by FirstEnergy's Board of Directors*** and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section.

\* \* \*

If the Company confirms a violation of laws, rules, regulations or this Code, the Company will take corrective action against the offending individual, including discipline up to and including termination of employment, as appropriate.

Guiding Principles of Business Conduct

It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct and ongoing dialogue. In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.

"Maintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."

Relationships with Others

*Fair Dealing* - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with

90

government employees. You should direct any questions about dealing with government employees to your supervisor.

* * *

*Conflicts of Interest* - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy. A "conflict of interest" can occur when your personal interest interferes with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively. Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities. This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company. This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship. Furthermore, the Company will not make any loans or guarantees to executive officers or their family members. You also have the specific responsibility of understanding and abiding by the Company's expanded Conflicts of Interest Policy.

* * *

*Protection of Corporate Assets, Including Corporate Funds* - We have a responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. ***Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes.*** Do not keep undisclosed funds nor establish any undisclosed accounts while conducting your work. Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment.

* * *

*Political Activities* - FirstEnergy participates in the political process through political action committees and lobbying activity to the extent permitted by law. Do not bring pressure on personnel, customers, suppliers or shareholders, etc. to contribute to, support, or oppose any political group or candidate.

* * *

*Compliance with the Law* - Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications

91

from your immediate supervisor or the Legal Department. Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

* * *

*Insider Trading* - Because we are a public company, we are subject to a number of laws and regulations concerning the purchase and sale of our stock and other publicly traded securities, as well as laws and regulations concerning disclosure of Company information to anyone outside the Company. Regardless of your position with us, if you are aware of what is known as "material non-public information" regarding our Company, business, affairs or prospects, you may not disclose that information to anyone outside our Company, and you are not permitted to buy or sell our stock or other publicly-traded securities of the Company until the material non-public information is known not only by individuals within our Company, but also by the general public.

"Material non-public information" is any information concerning us that is not available to the general public and which an investor would likely consider to be important in making a decision whether to buy, sell or hold our stock or other securities. A good rule of thumb to determine whether information about us is material non-public information is whether or not the release of that information to the public would have an effect on the price of our stock. The improper use of material non-public information is known as insider trading. Insider trading is unethical and a criminal offense and is strictly prohibited. All personnel should read and understand the Company's Insider Trading Policy, which is available on the Company's portal.

205.    The Board of Directors' Code of Ethics and Business Conduct, which "each director must comply with," confirms that the fiduciary responsibility of the Board includes compliance with laws. In a section titled "Compliance with Laws, Rules, and Regulations," the code states, "Directors shall comply, and oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company, including insider trading laws." The Board of Directors' Code of Ethics and Business Conduct adds that "Directors shall proactively promote ethical behavior and take steps to ensure the Company… encourages employees to report violations of laws, rules, regulations…."

206.     This is further emphasized in the Company's Corporate Governance Policies, which state in part:

> The Board believes that the long-term success of the Company is dependent upon the maintenance of an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates.

> Board and committee agendas and materials are established with legal and regulatory requirements in mind. The Board expects that Directors will acknowledge adherence to the Board of Directors Code of Ethics and Business Conduct and that management will acknowledge adherence to and conduct operations consistent with the Code of Business Conduct…

207.     Regarding "Board Access to Senior Management," the Company's Corporate Governance Policies state in part the following:

> Directors have complete access to management and, as needed, the books and records of the Company. It is assumed that Directors will use judgment to be sure that this contact is not distracting to the business operation of the Company and that such contact, if in writing, be copied to the CEO and to the Chairman, if the Chairman is not the CEO.

> Furthermore, the Board encourages management to, from time to time, bring managers into Board meetings who: (a) can provide additional insight as to the items being discussed because of personal involvement in these areas, and/or (b) are individuals with future potential that the senior management believes should be given exposure to the Board.

208.     FirstEnergy's Conflicts-of-Interest Policy, which was reviewed and approved by Defendant Yeboah-Amankwah, also states, among other things, that:

> All personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, have an obligation to conduct Company-related business in an environment free from the influence of conflicting personal interests. Generally, a conflict of interest arises when our position or job responsibilities present an opportunity for personal gain or when an obligation or situation resulting from our personal activities and financial affairs may influence our judgment and action in the performance of our Company duties.

209.    Defendants' duties to actively identify and report illegal or unethical business practices within the Company were also identified in the Company's Political Activity Policy, which includes the following:

> Under federal law, there are limits on a corporation's ability to give direct corporate contributions to federal candidates and national political parties. Accordingly, FirstEnergy does not contribute corporate funds directly to federal political candidates or parties.
>
> Each state has different laws, rules and regulations governing political contributions in state and local elections. Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations.
>
> Our contribution decisions are based on what is in the best interests of FirstEnergy and not based on the personal preferences of our executives.

210.    Additionally, FirstEnergy has adopted an Insider Trading Policy which applies to all officers and employees of the Company and its subsidiaries, and to all members of the Company's Board to promote compliance with applicable securities laws. Specifically, the policy states:

> It is the policy of the Company that no member of the Board, officer or other employee of the Company who is aware of material nonpublic information relating to the Company may, directly, or indirectly through family members or other persons or entities:
>
> 1.    Engage in transactions in Company Securities, except as otherwise specified in this Policy under the headings "Transactions Under Company Plans," "Transactions Not Involving a Purchase or Sale" and "Rule 10b5-1 Plans;"
>
> *  *  *
>
> It is also the policy of the Company that no member of the Board, officer or other employee who, in the course of working for the Company learns of material nonpublic information about a company with which the Company does business, including a customer or supplier of the Company, may trade in that company's securities until the information becomes public or is no longer material.

211.    Further, the Board maintains several standing committees to monitor specific aspects of FirstEnergy's business, the membership of which is summarized below:

| | Audit Committee | Compensation Committee | Corporate Governance and Corporate Responsibility Committee | Finance Committee | Operations, Safety and Nuclear Oversight Committee |
|---|---|---|---|---|---|
| Michael J. Anderson[72] | Chair | | | • | |
| Steven J. Demetriou[73] | | | | • | • |
| Julia L. Johnson | | | Chair | • | |
| Donald T. Misheff[74] | • | | • | | |
| Thomas N. Mitchell | | | • | | Chair |
| James F. O'Neil III[75] | | Chair | | | • |
| Christopher D. Pappas | | • | | Chair | |
| Sandra Pianalto[76] | • | • | | | |
| Luis A. Reyes | | | • | | • |
| Leslie M. Turner | • | • | | | |

[72] Corporate Governance and Corporate Responsibility Committee from 2016 through 2019. Audit Committee since 2020.

[73] Compensation Committee from 2018 through 2019. Operations, Safety and Nuclear Oversight Committee since 2020.

[74] Compensation Committee from 2016 through 2018. Corporate Governance and Corporate Responsibility Committee since 2019.

[75] Audit Committee from 2018 through 2019. Compensation Committee since 2020.

[76] Finance Committee from 2018 through 2019. Audit Committee since 2020.

212. The Corporate Governance and Corporate Responsibility Committee is currently composed of Defendants Johnson, Misheff, Mitchell, and Reyes. According to the Charter of the Corporate Governance and Corporate Responsibility Committee, that Committee's purpose is to, among other things, "develop, recommend to the Board, and periodically review the corporate governance policies applicable to the Company." The Charter of the Corporate Governance and Corporate Responsibility Committee further provided, "The Committee shall periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate participation, and dues and/or contributions to industry groups and trade associations."

213. The Compensation Committee is currently composed of Defendants O'Neil, Pappas, Pianalto, and Turner. According to the Charter of the Compensation Committee, the Compensation Committee's purpose is to, among other things, "review, discuss, and endorse a compensation philosophy and objectives that support competitive pay for performance and are consistent with the corporate strategy," and "assist the Board in establishing the appropriate annual salary, incentive compensation and equity-based plans for the Company's Section 16 Officers, remaining Executive Council members, and certain other senior-level officers . . . and to align such plans with Company and business unit performance, business strategies and growth in shareholder value."

214. The Charter of the Compensation Committee specifically provides that the job of the Committee is to, among other things:

      a.     Establish a process, considering objective and subjective performance criteria, to obtain an evaluation from all independent Directors of the CEO's performance;

      b.     Review and recommend for approval by the Board, corporate goals and objectives relevant to the compensation of the Section 16 Officers;

96

c.      Review, approve and inform the Board, corporate goals and objectives relevant to the compensation of the remaining Executive Council members or any other senior-level officers;

d.      At least annually, evaluate the CEO's performance in light of such corporate goals and objectives, present the results of such evaluation to the independent Directors of the Board, and cause such results to be communicated to the CEO;

e.      Review and recommend for approval by the Board, the CEO's compensation level based on the evaluation in (c) above (including annual salary, short-term incentive, long-term incentive and other direct and indirect benefits) to the independent Directors of the Board who shall determine and approve such compensation;

f.      In determining the long-term incentive component of the CEO's compensation, consider, among other items, the Company's performance and relative shareholder return, the value of similar incentive awards to CEOs at comparable companies, and the awards provided to the Company's CEO in the past;

g.      Review and recommend for approval by the Board, the compensation levels (including annual salary, short-term incentive, long-term incentive and other direct and indirect benefits) with respect to the Section 16 Officers other than the CEO;

h.      Review, approve and inform the Board, the compensation levels (including annual salary, short-term incentive, long-term incentive and other direct and indirect benefits) with respect to the remaining Executive Council members;

i.      Review new executive compensation programs and recommend for approval by the Board incentive compensation and equity-based plans and programs that

provide benefits to Section 16 Officers, remaining Executive Council members and certain other senior-level officers;

j.      Monitor executive compensation programs to determine whether they are properly coordinated and achieve their intended purpose.

k.      Modify (or, if applicable, recommend to the Board that it modify), as necessary and appropriate, any executive compensation program that yields payments and benefits that are not achieving their intended purpose, reasonably related to executive and corporate performance or not reasonably comparable to programs of peer businesses.

l.      For the CEO, periodically, and as appropriate, review and recommend for approval by the independent Directors of the Board any (i) employment agreements and severance arrangements; (ii) change in control agreements and change in control provisions affecting any elements of compensation and benefits; and (iii) special or supplemental compensation and benefits. For all non-CEO Section 16 Officers and remaining Executive Council members, periodically, and as appropriate, review and recommend for approval (i), (ii), or (iii) referenced above by the Board;

m.      Annually assess the rigor of the performance targets and ranges included in the Company's short-term and long-term incentive programs for Section 16 Officers, remaining Executive Council members and other senior-level officers.

n.      Oversee the risk assessment of the Company's compensation arrangements applicable to the Company's Section 16 Officers, remaining Executive Council members, other senior-level executives, and other employees and review and discuss at least annually the relationship between risk management policies and practices and compensation and

determine whether any such policies and practices are reasonably likely to have a material adverse effect on the Company.

       o.     Administer or oversee the administration of the Company's compensation plans, including stock option and other non-qualified deferred compensation plans, of the Company in accordance with the terms of such plans.

       p.     Review and make recommendations to the Board regarding the Company's compensation plans and policies, including incentive compensation plans and policies and equity-based plans and policies, taking into account the results of the most recent Say-on-Pay vote.

215.    The Audit Committee is currently comprised of Defendants Anderson, Misheff, Pianalto, and Turner. According to FirstEnergy's Audit Committee Charter, the Audit Committee's purpose is to, among other matters, "assist the Board with oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal, risk management and regulatory requirements. . . . and (v) the Company's systems of internal controls with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements."

216.    The Audit Committee's Charter in effect during the Relevant Period specifically provided that the job of the Committee is to, among other things, "review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor," "oversee, require and review periodic evaluations of the Company's internal control and corporate compliance structures," and to "oversee, assess, discuss, and review the Company's policies with respect to the Company's . . . assessment and management of risks . . . ." The Audit Committee's Charter also states:

Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review the record keeping and reporting systems to measure and monitor regulatory compliance requirements.

217.    Defendants failed to meet their responsibilities and obligations as provided in the Charter of the Audit Committee, the Charter of the Compensation Committee, the Charter of the Corporate Governance and Corporate Responsibility Committee, the Code, the Board of Directors Code of Ethics and Business Conduct, Corporate Governance Policies, Conflicts-of-Interest Policy and Political Activity Policy. Defendants' illegal course of conduct constituted breaches of their fiduciary duties to FirstEnergy, as well as violations of state and federal law, and resulted in significant harm to the Company.

## VIII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

218.    Plaintiff realleges and incorporates ¶¶1-217 above.

219.    Plaintiff is a current owner of FirstEnergy common stock and was owner of FirstEnergy common stock during the period relevant to Defendants' wrongful course of conduct alleged herein. FirstEnergy is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

220.    Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, unjust enrichment, corporate waste, gross mismanagement, contribution and indemnification, and violations of Section 14(a) of the Exchange Act. Plaintiff will adequately and fairly represent the interests of FirstEnergy in enforcing and prosecuting its rights. Prosecution of this action, independent of the FirstEnergy Board, is in the best interests of the Company.

221.    The FirstEnergy Board, at the time of filing of this action, consisted of the eleven Director Defendants; accordingly, Plaintiff needs only to allege demand futility as to six of those eleven directors. As alleged above, Defendants breached their fiduciary duties of loyalty and good faith by, *inter alia*, (i) engaging in a course of conduct that violated the Company's policies and public statements; (ii) failing to disclose to the investing public material adverse information regarding FirstEnergy's business; (iii) failing to properly monitor the Company's operations, which led to FirstEnergy's involvement in the Ohio bribery scheme; and (iv) consciously disregarding numerous red flags related to the Ohio bribery scheme.

222.    Plaintiff has not made any demand upon the FirstEnergy Board to bring an action on behalf of the Company asserting claims herein to recover damages for the injuries suffered by FirstEnergy, since such demand would have been a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein.

### A.    Demand is Excused Because the Director Defendants Face a Substantial Likelihood of Liability

223.    Demand is excused because the Director Defendants face a substantial likelihood of liability for the claims asserted against them in this Complaint, given their awareness or conscious disregard of significant red flags relating to the Ohio bribery scheme due to the breakdown in FirstEnergy's internal controls and compliance functions.

### 1.    The Director Defendants Face a Substantial Likelihood of Liability for Disseminating False and Misleading Proxy Materials

224.    Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, Pappas, and Reyes were all directors as of March 2017, when they voted against a shareholder proposal requesting transparency and accountability on lobbying policies and payments that would have required disclosure of the Ohio bribery scheme here. Similar shareholder proposals were defeated

101

in 2015 and 2016 with Defendants Anderson, Johnson, Jones, Misheff, Pappas, and Reyes recommending shareholders vote against the proposals in each of those years.

225. Specifically, FirstEnergy filed its proxy statement with the SEC on March 31, 2017 (the "2017 Proxy"). The 2017 Proxy included a shareholder proposal requiring an annual report on lobbying policies and payments. The proposal, by The Nathan Cummings Foundation, noted that that "full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders"—and that the while the Company's disclosed federal lobbying exceeded $4 million in 2014 and 2015, its state lobbying payouts went undisclosed. This posed a "reputational risk," and "absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Accordingly, The Nathan Cummings Foundation proposed that the Company prepare an annual report disclosing:

> 1. Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.
>
> 2. Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.
>
> 3. FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.
>
> 4. A description of the decision making process and oversight by management and the Board for making payments described in section 2 and 3 above.
>
> * * *
>
> The report shall be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

226. Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, Pappas, and Reyes responded by dismissing the proposal and recommending that shareholders vote against it,

and instead rely on the existing disclosure framework—that failed to detect and disclose the funds that FirstEnergy was already funneling to Householder.

227.     Thus, the Company's Board has demonstrated long-standing opposition to transparency regarding payments to state public officials, as its recommendation to vote against shareholder proposals requiring such disclosure in 2015, 2016, and 2017 demonstrates. Moreover, in 2017, just months after the Ohio bribery scheme started, a majority of the current Board recommended that shareholders vote against the proposal that would have required disclosure of the illegal payments at issue, demonstrating that demand on the current Board to take action in response to the illegal payments would be futile.

228.     In addition, the Director Defendants each negligently issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies as described above. These Proxies misleadingly suggested that the Board maintained effective risk management and omitted any disclosures regarding (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within FirstEnergy; and (iii) the fact that FirstEnergy's compensation program actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices. As a result, the Director Defendants each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile.

### 2.     The Director Defendants Face a Substantial Likelihood of Liability for Failing to Exercise Their Fiduciary Duties to FirstEnergy

229.     During the Relevant Period, Director Defendants Anderson, Misheff, Pianalto, and Turner served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's

internal controls, and ensuring that the Company was in compliance with legal and regulatory requirements (and the Code). Defendants Anderson, Misheff, Pianalto, and Turner breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein, which ultimately led the Company to become embroiled in the Ohio bribery scheme and become the subject of investigations by the U.S. Attorney and FBI. According to the Company's Proxy Statements filed with the SEC, the Audit Committee met at least 32 times from 2016 through 2019. Therefore, Defendants Anderson, Misheff, Pianalto, and Turner face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

230.    During the Relevant Period, Defendants O'Neil, Pappas, Pianalto, and Turner served as members of the Compensation Committee. Pursuant to the Compensation Committee Charter, the members of the Compensation Committee were and are responsible for*, inter alia*, developing, recommending to the Board, and periodically reviewing the Company's compensation system, as well as assessing risks related to the compensation system. The Charter of the Compensation Committee further required that Committee's members "review, discuss, and endorse a compensation philosophy and objectives that support competitive pay for performance and are consistent with the corporate strategy," and "assist the Board in establishing the appropriate annual salary, incentive compensation and equity-based plans for the Company's Section 16 Officers, remaining Executive Council members, and certain other senior-level officers . . . and to align such plans with Company and business unit performance, business strategies and growth in shareholder value." Defendants O'Neil, Pappas, Pianalto, and Turner breached their fiduciary

104

duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, allowed or permitted the Company to engage in the illicit activity described herein, and encouraged risky conduct through the Company's compensation system, which ultimately led the Company to become embroiled in the Ohio bribery scheme and become the subject of investigations by the U.S. Attorney and FBI. Based on the Company's Proxy Statements filed with the SEC, the Compensation Committee met at least 24 times from 2016 through 2019. Therefore, Defendants O'Neil, Pappas, Pianalto, and Turner face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

231. During the Relevant Period, Defendants Jones, Misheff, Mitchell, and Reyes served as members of the Corporate Governance and Corporate Responsibility Committee. Pursuant to the Corporate Governance and Corporate Responsibility Committee Charter, the members of the Corporate Governance and Corporate Responsibility Committee were and are responsible for, *inter alia*, developing, recommending to the Board, and periodically reviewing the corporate governance policies applicable to the Company. The Charter of the Corporate Governance and Corporate Responsibility Committee further required that the Committee's members "periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate participation, and dues and/or contributions to industry groups and trade associations." Defendants Jones, Misheff, Mitchell, and Reyes breached their fiduciary duties of due care, loyalty, and good faith, because the Corporate Governance and Corporate Responsibility Committee, *inter alia*, allowed or permitted the Company to engage in the illicit activity described herein, which ultimately led the Company to become embroiled in the Ohio bribery scheme and become the subject of investigations by the U.S. Attorney and FBI. Based on the Company's Proxy Statements filed with the SEC, the Corporate Governance and Corporate Responsibility Committee met at

least 21 times from 2016 through 2019. Therefore, Defendants Jones, Misheff, Mitchell, and Reyes face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

232.    In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal or SEC sanctions. This they will not do. Specifically, in addition to FirstEnergy, Defendant Jones has been named as a defendant in at least two putative class actions asserting violations of §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 in connection with FirstEnergy's issuance of materially false and misleading statements and financial reports. The participation of Jones, along with Defendants Pearson, and Strah in the alleged fraud is detailed in the Complaint for Violations of the Federal Securities Laws filed in that matter on July 28, 2020, and because all of the other board members are beholden to defendant Jones, they cannot effectively investigate and prosecute the claims detailed herein.

233.    For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

### B.    Demand is Excused Because Director Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment

234.    Demand is also excused because the wrongful acts complained of in this Complaint are not a valid exercise of business judgment. The Board's challenged misconduct at the heart of this case constitutes unlawful/illicit activity or the facilitation of illegal/illicit activity. In essence, as the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and/or condoned a business strategy based on violations of law and/or statutes

106

(federal and/or state). Breaking the law and/or violating a federal and/or state statute is not a legally protected business decision, and such conduct is incapable of ratification because it cannot be considered a valid exercise of business judgment.

235.    The sheer size of the contributions—totaling approximately $60 million—could not be done without the Director Defendants' knowledge and approval, or their conscious and knowing disregard of these contributions and their abject failure to properly exercise oversight over the Company. All of the Director Defendants were required to participate in both the review and approval of FirstEnergy's activities including payment of approximately $60 million designed to assist Householder's Enterprise, which resulted in a legislative kickback through the passage of HB6 of approximately $1.3 billion. Indeed, Defendant Jones has publicly stated that FirstEnergy is innocent and "acted ethically" in connection with efforts to pass HB6 that the U.S. Attorney says was fueled by bribery, which acknowledges that Defendants were aware of the decision to funnel bribes to Householder's Enterprise, and approve them.

236.    In addition, the Director Defendants' acts evidence a pattern of conduct showing a wholesale abandonment of the Director Defendants' fiduciary duties. Those acts, set forth in this Complaint which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been. Simply put, approving the violations of applicable law and/or statutes by others, or looking the other way while refusing to prevent others under the Board's control from violating the law and/or statutes are all forms of misconduct that cannot under any circumstance be examples of legitimate business conduct. Because condoning a business strategy predicated on breaking the law and/or violating state and/or federal laws cannot be a valid exercise of business judgement, demand upon the Board is excused.

237.    The Director Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate that they knowingly adopted, endorsed, or condoned a business strategy that prioritized securing legislative relief ahead of compliance with laws, which cannot be considered a legitimate exercise of business judgment. Demand is therefore excused.

238.    At the time the action was initiated, the principal professional occupation of Defendant Jones was (and is) his employment with FirstEnergy as its CEO, pursuant to which he receives substantial monetary compensation and other benefits. In addition, according to the 2020 Proxy, Defendants have admitted that Defendant Jones is not independent. Thus, Defendant Jones lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, Jones has already publicly defended the Company and its actions in connection with the Ohio bribery scheme, stated that the Company is innocent and that it acted ethically. Thus, a demand on Jones would be futile.

239.    As detailed above, the non-employee Director Defendants each received lavish compensation packages for their services as Directors. The continuation of this extravagant compensation to each Director Defendant is dependent upon his or her cooperation with other Board members, and his or her participation and acquiescence in the wrongdoing described in this Complaint. The Director Defendants are therefore incapable of exercising independent and disinterested judgment, and demand upon them would be futile.

240.    Moreover, Directors Misheff and Pappas serve together on the Trinseo S.A. board of directors. Misheff has been a director since February 2015 and Pappas since October 2010. In

addition, Pappas was Trinseo's President and CEO from June 2010 through March 2019, and is currently a Special Adviser to Trinseo's President and CEO.

241.    Directors Misheff and Demetriou served together on the Aleris Corporation board of directors. Misheff served as a director from December 2013 through April 2018. Demetriou served as Chairman and CEO from 2004 through 2015.

242.    Misheff serves on the TimkenSteel Corporation board of directors. Also currently serving on TimkenSteel's board is Leila Vespoli, who was FirstEnergy's Executive Vice President of Corporate Strategy, Regulatory Affairs and Chief Legal Officer from May 2016 through April 2019. TimkenSteel, headquartered in Canton, Ohio, is a steel manufacturer that produces high-performance carbon and alloy steel products for the automotive, industrial, and energy markets. TimkenSteel publicly supported passage of HB6, with its Senior Manager of Government Affairs & Energy Commodity Joe Price testifying before the Ohio House Energy and Natural Resources Committee on May 15, 2019. In his submitted testimony, Price told the committee that as a very large consumer of electricity, TimkenSteel supported HB6 because the bill established a cap on charges to fund clean energy, maintained an energy efficiency opt-out which benefitted the company, and "most significantly," eliminated a mandate that required the purchase of renewable energy, which he said created costs to the company that were "significant" and "rising."[77] HB6, Price concluded, benefitted TimkenSteel by turning "a cost into a savings." TimkenSteel also supported Householder, donating $5,000 to his Friends of Householder PAC in February 2020.

---

[77] Testimony of Joe Price, Senior Manager of Government Affairs & Energy Commodity, before the Energy and Natural Resources Committee, Ohio House of Representatives (May 15, 2019), available                                    at                                    http://search-prod.lis.state.oh.us/cm_pub_api/api/unwrap/chamber/133rd_ga/ready_for_publication/committee_docs/cmte_h_energy_1/testimony/cmte_h_energy_1_2019-05-15-0900_583/testimony_proponent_joeprice_timkensteel_5.15.2019.pdf.

243.     For all of these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

## IX.     CLAIMS AGAINST DEFENDANTS

### COUNT I
**(Breach of Fiduciary Duty Against the Director Defendants)**

244.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth in this paragraph.

245.     Each of the Director Defendants owed and owe fiduciary duties to FirstEnergy and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe FirstEnergy the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

246.     Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to FirstEnergy by consciously ignoring numerous red flags related to the Ohio bribery scheme.

247.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

248.     Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

249.     Further, as alleged in detail herein, each of the Defendants (and particularly the Defendants on the Audit Committee) had a duty to ensure that FirstEnergy disseminated accurate, truthful, and complete information to its shareholders. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to FirstEnergy shareholders materially misleading and inaccurate information through, *inter alia*, FirstEnergy's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

250.     Accordingly, to the extent any FirstEnergy exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for their breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the Ohio bribery scheme: (i) involved breaches of their duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law. FirstEnergy's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

251.     As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

252.     As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## COUNT II
### (Breach of Fiduciary Duty Against the Officer Defendants)

253.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph. This Count is brought against the Officer Defendants solely in their capacity as officers of FirstEnergy.

254.     The Officer Defendants owed and owe fiduciary duties to FirstEnergy and its stockholders. By reason of this fiduciary relationship, the Officer Defendants specifically owed and owe FirstEnergy the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

255.     The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false proxy statements or consciously ignoring numerous red flags related to the Ohio bribery scandal.

256.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

257.     Additionally, the Officer Defendants are not entitled to claim any immunity under ORC 1701.59(E) to the extent this claim is asserted against them in their capacity as officers of the Company.

258.     As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

259.     As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT III
### (Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against Defendants Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah)

112

260.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

261.    At the time of the stock sales set forth above, Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah knew or consciously disregarded the information described in this Complaint regarding the Ohio bribery scheme and sold or otherwise disposed of FirstEnergy common stock on the basis of that information.

262.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with the Ohio bribery scheme. The information was a proprietary asset belonging to the Company, which Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah used for their own benefit when they sold FirstEnergy common stock.

263.    Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah's sales of FirstEnergy common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

264.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary duties of Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah, the Company is entitled to the imposition of a constructive trust on any profits Defendants Jones, Strah, Pearson, Taylor, Reffner, Dowling, and Yeboah-Amankwah obtained thereby.

## COUNT IV
### (Unjust Enrichment Against All Defendants)

265.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

266.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of FirstEnergy in the form of, *inter alia*¸ salaries, bonuses, stock options, and/or other forms of executive compensation.

267.     Plaintiff, as a stockholder and representative of FirstEnergy, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants due to their wrongful conduct alleged in this Complaint.

**COUNT V**
**(Corporate Waste Against all Defendants)**

268.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

269.     By their wrongful acts and omissions, Defendants wasted FirstEnergy's valuable corporate assets by, among other things, causing the Company to pay improper fees, salaries, performance-based compensation and other benefits to Defendants who breached their fiduciary duties owed to FirstEnergy and its shareholders. FirstEnergy received no benefit from these improper payments. As a result, Defendants damaged FirstEnergy and are liable to the Company for corporate waste.

270.     Plaintiff, on behalf of FirstEnergy, has no adequate remedy at law.

**COUNT VI**
**(Contribution and Indemnification Against all Defendants)**

271.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

272.     FirstEnergy is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to FirstEnergy.

114

273.     FirstEnergy's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and FirstEnergy is entitled to contribution and indemnification from each Defendant in connection with all such claims that have been, are or may in the future be asserted against, FirstEnergy by virtue of the Defendants' misconduct.

<u>COUNT VII</u>
**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
Against the Director Defendants)**

274.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

275.     This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

276.     SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

277.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2018, 2019, and 2020 Proxies. These Proxies contained proposals to FirstEnergy

shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies, however, misleadingly suggested that the Board maintained effective risk management and omitted any disclosures regarding (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within FirstEnergy; and (iii) the fact that FirstEnergy's compensation program actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices.

278.    By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, FirstEnergy mislead and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding FirstEnergy's recommendations to re-elect and elect the current Board and provide advisory votes on executive compensation.

279.    The false and misleading information contained in the Proxies was material to FirstEnergy's shareholders in determining whether to re-elect and elect the current Board and provide advisory votes on executive compensation. This information was also material to the integrity of the directors who were proposed for election to the Board. Plaintiff, on behalf of FirstEnergy, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper election and reelection of the members of the Board, and advisory votes on executive compensation.

280.    This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## X.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.      A determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.      Declaring that Defendants have breached their fiduciary duties to FirstEnergy;

C.      Determining and awarding to FirstEnergy the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.      Directing FirstEnergy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

E.      Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of FirstEnergy, has an effective remedy;

F.      Awarding to FirstEnergy restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

G.      Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H.      Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## XI.    JURY DEMAND

Plaintiff demands a trial by jury.

117

Dated: September 9, 2020                         Respectfully Submitted,

*/s/ Robert R. Sparks*
**STRAUSS TROY**
Richard S. Wayne
Robert R. Sparks
Federal Reserve Building
150 E. 4th Street, 4th Floor
Cincinnati, OH 45202-4018
Phone: (513) 621-2120
rswayne@strausstroy.com

*Liaison Counsel for Employees Retirement System of the City of St. Louis*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Brandon T. Grzandziel
Adam Warden
Dianne M. Pitre
Mario Alvite
7777 Glades Road, Suite 300
Boca Raton, FL 33432
Phone: (561) 394-3399
Fax: (561) 394-3382

- and -

**SAXENA WHITE P.A.**
Steven B. Singer
Scott Koren
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
Fax: (888) 631-3611

*Counsel for Employees Retirement System of the City of St. Louis*

## **VERIFICATION**

I, Richard R. Frank, being duly sworn, declare as follows:

I am the Secretary of the Board of Trustees of the Employees Retirement System of the City of St. Louis ("St. Louis" or "Plaintiff") and am authorized to act on its behalf. St. Louis is a shareholder of FirstEnergy Corporation, and has been throughout the relevant period defined in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). St. Louis has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: ___09-04___, 2020

Richard R. Frank
Secretary, Board of Trustees
Employees Retirement System
of the City of St. Louis